UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

DIAPOLIS SMITH,                  )
                                 )
                  Petitioner,    )      Case No. 1:03-cv-87
                                 )
v.                               )      Honorable Gordon J. Quist
                                 )
MARY BERGHUIS,                   )
                                 )      **REPORT AND RECOMMENDATION**
                  Respondent.    )
_____  )

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and

Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 ("AEDPA"), the provisions of that

law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

Petitioner is serving a life sentence plus two years, imposed by the Kent County

Circuit Court on November 29, 1993, after a jury convicted Petitioner of second-degree murder,

MICH. COMP. LAWS § 750.317, and possession of a firearm during the commission of a felony,

MICH. COMP. LAWS § 750.227b. In his pro se petition, Petitioner raises twelve grounds for relief,

as follows:

> I.   PETITIONER WAS DENIED DUE PROCESS AND EQUAL
>      PROTECTION WHERE HE WAS TRIED BEFORE AN ALL-WHITE
>      JURY AND THERE WAS SYSTEMATIC UNDERREPRESENTATION
>      OF AFRICAN-AMERICANS ON KENT COUNTY JURIES IN 1992-1993.
>
> II.  THE TRIAL COURT IMPROPERLY AND UNCONSTITUTIONALLY
>      EXCLUDED RELEVANT AND ADMISSIBLE EVIDENCE OF A

WITNESS'S KNOWLEDGE OF A POLICE THREAT AGAINST HER SISTER.

III.   THE TRIAL COURT IMPROPERLY AND UNCONSTITUTIONALLY EXCLUDED RELEVANT AND ADMISSIBLE EVIDENCE THAT ROBERT GLASS ADMITTED TO COMMITTING THE SHOOTING.

IV.   THE PROSECUTOR IMPROPERLY AND UNCONSTITUTIONALLY ACTED AS A WITNESS BY CHALLENGING WITNESSES ON THE BASIS OF WHAT THEY ALLEGEDLY HAD TOLD THE PROSECUTOR.

V.   THE PROSECUTOR IMPROPERLY AND UNCONSTITUTIONALLY INTRODUCED GRAND JURY TESTIMONY AGAINST PETITIONER WHICH WAS NEVER SUBJECT TO CROSS-EXAMINATION.

VI.   THE TRIAL COURT IMPROPERLY AND UNCONSTITUTIONALLY EXCLUDED QUESTIONING OF ONE WITNESS ABOUT WHETHER ANOTHER WITNESS WAS IN A POSITION TO SEE A PARTICULAR EVENT.

VII.   ADMISSION OF TESTIMONY OF OFFICERS AS TO WHAT OTHERS TOLD THEM, OR WHAT THEY "ASCERTAINED" FROM WHAT OTHERS TOLD THEM, VIOLATED THE RIGHT OF CONFRONTATION.

VIII.   IMPROPER AND UNCONSTITUTIONAL ARGUMENT BY THE PROSECUTOR UNFAIRLY PREJUDICED THE PETITIONER.

IX.   THE LINEUP WAS UNDULY SUGGESTIVE.

X.   THE PROSECUTOR IMPROPERLY HAD HIS WITNESS TESTIFY TO MEETING THE PETITIONER IN JAIL.

XI.   COUNSEL WAS INEFFECTIVE BECAUSE OF HIS MANNER OF CONDUCTING THE JURY OBJECTION, FAILURE TO INVESTIGATE, FAILURE TO MAKE APPROPRIATE MOTIONS, AND FAILURE TO ASK RELEVANT QUESTIONS AT TRIAL.

XII.   INEFFECTIVE ASSISTANCE OF COUNSEL AND OTHER SENTENCING ERRORS REQUIRE RESENTENCING.

Respondent has filed an answer to the petition (dkt # 17) stating that the grounds should be denied because they are either noncognizable, procedurally defaulted, or without merit.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are either procedurally defaulted, without merit, or not cognizable on habeas review.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the shooting of Christopher Rumbley at So-So's Bar in Grand Rapids in the early morning hours of November 7, 1991.  Petitioner was charged with open murder and possession of a firearm during the commission of a felony.  He also was charged with assault with intent to murder against Naeem Wahid, together with a second count of felony-firearm for that offense.  An initial preliminary hearing was held February 24, 1992.  On May 29, 1992, the prosecutor filed a *Nolle Prosequi*.  After grand jury proceedings, a new preliminary examination was held on April 1, 1993, and Petitioner was bound over on all charges.  Petitioner was tried before a jury beginning September 13, 1993, and concluding on October 5, 1993.  After four days of deliberations, the jury returned a verdict convicting Petitioner of second-degree murder and one count of felony-firearm.  Petitioner was found not guilty of the charge of assault with intent to commit murder and the second count of felony-firearm.  (Tr. XII, 1733-37.)[1]

Before the jury was sworn, defense counsel objected to the jury on the grounds that the jury array violated his rights under the equal protection clause.  Counsel based his argument on

---

[1]Trial transcripts have labeled by the court reporter as Volumes I to XII and shall be referred to hereafter as "Tr. [Volume Number], [page number]."

the fact that the venire of sixty jurors included only two or three potential black jurors.  The trial court rejected Petitioner's claim, holding that the same procedures for jury venire selection had been used by Kent County for many years.  (Tr. I, 148-51.)

Thirty-seven witnesses testified at trial, with significant variations in descriptions and identifications.  Because of the variations in the events presented by witnesses at trial, I will discuss each witness' testimony in turn.

The first witness was Willie McIntosh, a bouncer at So-So's Bar.  McIntosh testified that November 6, 1991, was Ladies Night at So-So's, when women are admitted free of charge.  The bar was crowded, with about 300 people present.  As they came in the door, bar patrons were screened for weapons with a hand-held metal detector.  (Tr. II, 172-74.)  As McIntosh was standing near the rear of the bar, he became aware of a commotion, and he and Naeem Wahid (also known as Jimmy Davis) turned to go towards the fight.  The crowd began to run, and Wahid and McIntosh approached the fight from different directions.  When McIntosh got near Wahid, Wahid shouted "Look out, they got a gun."  (Tr. II, 176-77.)  McIntosh looked over his shoulder and saw an arm raised, holding a gun.  The arm was covered with the sleeve of a dark jacket with red and white on it.  (Tr. II, 177.)  McIntosh jumped behind a table.  (Tr. II, 178.)  Just after he heard Wahid shout, he heard Wahid get shot, followed by about three other shots.  (Tr. II, 180-81.)   About ten or 15 seconds later, McIntosh saw Christopher Rumbley lying on the floor.  (Tr. II, 181-82.)  On cross-examination, McIntosh testified that men entering the bar had the metal-detector wand passed over their bodies.  Women, however, only had their purses scanned.  (Tr. 189.)  McIntosh testified that he did not see Petitioner in So-So's that evening and he did not see him with a gun.  (Tr. II, 203-04.)

McIntosh also testified that he knew a man named Rod Fee, who looks very similar to Petitioner, though he was not sure whether Fee was in the bar on the night of the shooting.  (Tr. 205-06.)

Katherine Brown testified that she had come to So-So's on the evening in question with her sister, Dorothy Brown, and a friend, Tonya Griver.  The three went to the back of the bar (Tr. II, 213.)  They stood and talked with Petitioner and a friend of his.  (Tr. II, 215.)  Katherine had never met Petitioner before that evening, and her sister introduced him as "Baby D."  (Tr. II, 216.)  Katherine testified that Petitioner was wearing a blue and red jogging suit and that he had shoulder length hair at the time.  (Tr. II, 220-21.)  Petitioner's friend was wearing a blue jogging suit and had short hair.  (Tr. II, 222-23.)

Katherine Brown testified that she heard two shots that evening, the first of which she did not witness.  (Tr. II, 228.)  As Katherine and Dorothy Brown were standing near Petitioner, a fight broke out between Petitioner's friend and another man.  (Tr. II, 217.)  Petitioner went over and began to assist his friend in fighting the other man, whom she identified as the victim, Christopher Rumbley.  (Tr. II, 218-19.)  According to Katherine, Petitioner grabbed the shirt collar of the victim and then shot him.  (Tr. II, 219.)  Katherine Brown testified that Petitioner was three to five feet from the victim at the time of the shooting.  (Tr. II, 220.)  She was standing 20 to 25 feet from Petitioner at the time.  Following the shooting, Petitioner and his friend left by the front door.  When Katherine and Dorothy Brown left the bar shortly thereafter, they saw Petitioner driving a green car out of the alley at the back of So-So's.  (Tr. II, 222-24.)

Katherine Brown acknowledged that on January 19, 1992, she attended a lineup at the Kent County Jail, where she did not identify either Petitioner or anyone else.  (Tr. II, 225-26.)  At trial, she testified that while she had seen Petitioner, she did not really understand the question

asked of her at that time.  She also testified that she did not really recognize Petitioner.  (Tr. II, 226.)

Between the time of the incident and the lineup, Petitioner had cut his long hair and was virtually

bald.  Katherine Brown identified Petitioner at trial as Number 4 in the lineup picture.  (Tr. II, 226-

27.)  She also identified Petitioner at the preliminary examination.  (Tr. II, 228.)

        On cross-examination, Katherine Brown acknowledged that at the preliminary

examination she stated that she did not actually see the gun, and she again stated at trial that she did

not see the gun.  (Tr. II, 234-35, 251.)  She also acknowledged that the lighting was low, that she had

been in the bar drinking for a couple of hours, and that there were four to six people between her and

the fight.  (Tr. II, 236, 240-41.)  In addition, cross-examination revealed that she had not identified

Petitioner until after learning that her sister had identified him in the lineup.  (Tr. II, 249-50, 254-55.)

She also acknowledged that the person she identified as Petitioner held the victim by the collar and

was struggling with him, and that numerous other people were near the victim at the time of the

shooting.  (Tr. II, 259-60.)  On redirect, Katherine testified that she saw Petitioner shoot the victim.

Her testimony regarding not seeing the gun meant that she did not see Petitioner hold it up.  She only

saw him shoot it.  (Tr. II, 265-70.)

        The next witness was trauma surgeon and emergency room physician, Dr. Eric

George.  Dr. George testified that at approximately 1:30 a.m. on November 7, 1991, he treated

Naeem Wahid for a gunshot wound to his right thigh.  He surgically removed the bullet and turned

it over to the police.  (Tr. II, 274-75.)  He testified that, had the bullet lodged a centimeter deeper,

it could have resulted in a devastating injury or death.  (Tr. II, 276-77.)  He testified that the bullet

appeared to have entered on a trajectory that was roughly parallel to the ground.  (Tr. II, 283-84.)

Dorothy Brown testified that she was at So-So's with her sister on the evening of the shooting. Dorothy met Petitioner at City Lights a week before the shooting, and she talked with him by phone two days later. (Tr. II, 287-88.) At City Lights, Petitioner was accompanied by several people, one of whom he introduced as his brother. (Tr. II, 288.) She knew Petitioner by the name "Baby D." (Tr. II, 290.) Petitioner at that time had long hair styled in waves toward the back. (Tr. II, 290.)

Dorothy Brown testified that when she saw him at So-So's on November 6, 1991, Petitioner again was accompanied by the man he had introduced as his brother. (Tr. II, 289.) She and her sister talked with Petitioner and his brother. (Tr. II, 289.) At some point, Petitioner's brother began to argue with Christopher Rumbley. (Tr. II, 292.) Petitioner walked over to Rumbley and his brother. They all began arguing and a crowd formed around them. She could not see much because of the crowds. She heard a gunshot. When she looked, she saw Rumbley on the floor and Petitioner standing right over him. (Tr. II, 293-94.) As Petitioner and his brother left the bar, Dorothy Brown observed that both were holding guns. (Tr. II, 295, 302-03.) Approximately a minute later, Dorothy and Katherine Brown left the bar. (Tr. II, 297.) She saw Petitioner driving away in a green car, accompanied by his brother and two others. (Tr. II, 297-98.) Petitioner called Dorothy the next day, and she testified that she felt scared because of the shooting. (Tr. II, 299.) Dorothy identified Petitioner at a police lineup. (Tr. II, 300-01.) She testified that she did not see who shot Rumbley. (Tr. II, 317.) She also acknowledged on cross-examination that in February 2002 she had told Detective Lyzenga and had testified at the first preliminary examination that she did not see Petitioner with a gun. (Tr. II, 319, 326-27.)

Laura Dean testified that she arrived at So-So's with her friend Eva Price at about 9:00 p.m. on the night of the shooting. (Tr. III, 351.) She met up with a man she knew as Scarface, together with his cousin and friend. (Tr. III, 353-54.) After a short period of time, the friend came up to Scarface and the next thing she knew, Scarface and his friend were involved in a fight. Everyone had begun running and the scene had become confusing when a shot was fired. Dean saw shots coming from the direction of Scarface's cousin. (Tr. III, 356-57.) She described the cousin as being tall, light-skinned, with thick eyebrows, and "real pretty hair" that he wore pulled back in a ponytail. He was wearing a black hooded sweatshirt and a blue Duke starter jacket. (Tr. III, 357-58.) Dean previously told police that she had seen Petitioner pull a gun and shoot it. She clarified at trial that she saw Petitioner pull a gun and that the shooting came from his direction, but she could not be sure Petitioner did the shooting. (Tr. III, 358-59.) She identified Petitioner at a lineup, though he looked quite different because he had cut his hair, and she again identified him at trial. (Tr. III, 359-60.) She testified on cross-examination that she could not be entirely sure of her identification and could not be confident if shown someone who looked similar. (Tr. III, 378-79.) She testified that she left the bar quickly after the shooting. She saw Petitioner, Scarface and others in a car, and she spoke with Scarface. (Tr. III, 363-64.) Two days later, while working at the Holiday Inn, she was given a message that someone wanted to see her in the swimming pool area. When she went down, she saw Scarface, Petitioner and the other person who had been in So-So's on the night of the shooting. She spoke briefly to Scarface, but never spoke with Petitioner.

Arthur Snyder testified that he was a prisoner security guard or turnkey working at the City of Grand Rapids Jail at the time of Petitioner's arrest on February 12, 1992. Snyder testified that when Detective Lyzenga brought Petitioner in, Snyder asked Petitioner whether he had been

arrested in Grand Rapids before.  Petitioner responded that he had never been in Grand Rapids before.  (Tr. III, 404-05.)

The next witness was Ernest Watson.  He testified that he had been in So-So's on the evening of the shooting.  Watson stated that the fight broke out as he was at the front of the bar preparing to leave to drive someone home.  (Tr. III, 414-15.)  He saw the back of a man holding a gun.  The man he saw had a "fade" haircut, with the hair cut very close on the sides and longer on top, standing up.  (Tr. III, 425-26, 428.)  Watson heard several shots and people falling, some of whom fell on him.  (Tr. III, 415.)  Watson testified that he attended a lineup, at which he picked another man.  However, on his way home, he told the detective that he had picked the wrong person, and that the correct individual was Number 4, Petitioner.  (Tr. III, 419, 431.)  On cross-examination, he testified that other witnesses suggested to him at the station that the correct person was Number 4.  (Tr. III, 423, 429.)  Watson testified at trial that the person he saw with the gun was not Petitioner.  (Tr. III, 426-27.)

Tonia Griver went to So-So's with Dorothy and Kathy Brown, but she did not stay with them in the bar all evening.  (Tr. III, 431.)  Dorothy Brown introduced her to Petitioner, calling him "Baby D."  (Tr. III, 432.)  Griver identified Petitioner at trial, but noted that he had longer hair at the time of the shooting.  (Tr. III, 433.)  Griver was on the dance floor at the time the fight began.  She heard two shots, and she dove into the DJ booth for a few minutes.  (Tr. III, 435-36.)  She then came out and looked at the victim, whom she knew and had talked to earlier in the evening.  (Tr. III, 436-37.)  She went outside to find Dorothy and Kathy, then went back inside.  She stayed in the bar with the victim's best friend, JB, trying to calm him down.  (Tr. III, 437-38.)  She did not see the

shooting or see anyone with a gun.  (Tr. III, 439.)  At the lineup, Griver picked Petitioner as someone who had been in the bar, but she testified that she did not see him do any shooting.  (Tr. III, 444.)

Garlinda Bowman testified that she also was present at So-So's on the night of the shooting.  She testified that she was at the next table from the fight.  She heard a man say he had "nothing to do with that" and that he was leaving.  (Tr. III, 450.)  As he turned to go toward the front, he was hit by a man, and two more joined him, hitting, kicking and punching.  (Tr. III, 450-51.)  People began running and she heard someone yell, "He's got a gun."  (Tr. III, 452.)  She heard two shots, though she at first thought they were part of the music.  (Tr. III, 452.)  She saw no one with a gun that night.  (Tr. III, 453.)  She saw the body on the floor immediately after the shots.  (Tr. III, 454.)  At the lineup, Bowman identified no one because she was afraid they could see her.  She told the detective on the way home that she recognized Number 4, Petitioner, as having been involved in the beating.  (Tr. III, 457.)

Wilfred Joiner testified that he came to So-So's with Willie Johnson at about 11:00 p.m. on the evening of the shooting.  He was on the dance floor when the fight broke out.  (Tr. III, 480-81.)  He saw between three and six people fighting, with one man being beaten up.  (Tr. III, 482.)  One man was beating the victim with the butt of a handgun.  (Tr. III, 482, 494-95.)  Joiner testified that he saw a man get shot and he heard five or six shots.  (Tr. III, 485-86.)  He testified that he was unable to identify any of the people involved.  (Tr. III, 486.)

Sandra Buchanan testified that she went to So-So's with Tina Lyons.  A fight broke out in the bar, and she heard people shout that someone had a gun.  (Tr. 500-02.)  She was fleeing toward the front of the bar when the shots broke out.  She did not see the shooting or anyone with a gun.  (Tr. III, 504.)  She testified that one of the fighters looked like a man she knew, Rod Fee.  She

identified Petitioner as looking like Rod Fee.  (Tr. III, 505-06.)  She did not know whether the man she saw was Rod Fee or Petitioner.  (Tr. III, 506-07.)  At the lineup, she identified Number 4 as looking like Rod Fee.  (Tr. III, 508.)  She stated that she had seen him around a number of times both before and after the incident.  (Tr. III, 510-12.)  During all of the time she has known him, Rod Fee has worn a ponytail.  (Tr. III, 513.)

The next witness was Cheryl Butler.  Shortly before midnight on the night of the shooting, she went to So-So's with Yvonne Brady and a friend of Yvonne's.  (Tr. IV, 525.)  Butler was near the men's bathroom when she heard arguing, but she paid no attention and moved to the back bar.  She heard one shot fired, though people were saying four shots had been fired.  (Tr. IV, 527.)  She then saw a man walking who collapsed next to her and died.  (Tr. IV, 527-28.)  She identified Number 5 at the lineup as someone she had seen that night.  She did not identify Petitioner in the lineup and she testified that she did not see him in the fight or with a gun that evening.  (Tr. IV, 541.)

Randy Stewart testified that he went to So-So's shortly between 11:00 p.m. and 12:00 a.m. on November 6, 1991.  He talked with Dorothy Brown, and while they were dancing, Dorothy introduced him to the victim, Chris Rumbley.  (Tr. IV, 546-47.)  Later, he saw a fight begin between three men.  One hit another in the face with a glass.  (Tr. IV, 548.)  Stewart moved away toward the dance floor, when he heard someone say, "He's got a gun."  (Tr. IV, 548.)  He tripped over a chair and heard two gunshots.  (Tr. IV, 549.)  He remembered one of the men involved in the fight because he had bumped into him earlier, describing him as 6' 2", 220 pounds, wearing a black leather jacket and having a short haircut.  (Tr. 551, 559.)  Stewart testified that he had never seen Petitioner before. (Tr. IV, 560.)

Frank Sallie testified that he also was in So-So's Bar on the night of the shooting. While he was talking with friends, a fight erupted, in which chairs were overturned, glasses flew and two or three shots were fired. (Tr. IV, 569.) Several men were beating up another man. One seemed to be 6' 1", weighing 210-220 pounds. (Tr. 571-72.) He saw the person being shot and he saw fire coming from the gun, but could not identify who fired the shot, though he knows he had short cut hair. (Tr. IV, 576-77, 588.) He identified Number Two at the lineup as someone who had been in the bar. (Tr. IV, 578.)

Fred Parks testified that he had been to So-So's many times and that he was there with four friends on the night of the shooting. Parks stood near the DJ booth, as was his usual practice. (Tr. IV, 590-91.) He became aware of a fight taking place, and he moved to the farthest chair from the fight. (Tr. IV, 592-93.) He saw a number of people moving and then he heard three or four shots. (Tr. IV, 594.) Parks did not see the victim, the shooter or anyone involved in the fight. (Tr. IV, 596.) He attended a lineup at which he identified Number 4 as someone who was in the bar on the night of the shooting. (Tr. IV, 598.) He testified that Petitioner had been wearing a blue Detroit Piston's starter jacket that had some red and white on it. (Tr. IV, 598.)

Eva Price testified that she went to So-So's at about 10:30 p.m. in the company of Laura Dean. They stayed close to the front of the bar, near the women' restroom. (Tr. IV, 608.) She saw a man with a blue starter jacket and a blue baseball hat with a ponytail in back pull a handgun out of his jacket and fire two or three times. (Tr. IV, 608, 615-16.) At the lineup, she identified Petitioner as the man with the gun. (Tr. IV, 619.) Three days after the lineup, however, she saw the person who did the shooting driving a burgundy car, and he still had the long hair and deep eyebrows. (Tr. IV, 620.) She told police that the person she identified at the lineup was not the

shooter, though he looked quite similar. (Tr. IV, 622, 628.) She also testified that the bouncers were not using a metal detector on everyone that evening, only screening those they did not know and not screening women. (Tr. IV, 622-23.) Price also knew Dorothy Brown, and Dorothy introduced her to the person who did the shooting, who was not Petitioner. Dorothy Brown told Price that his name was "Rafael" or "Raffee" and that he was her man. (Tr. IV, 623-25, 627; Tr. VIII, 1179-81.) She testified that she saw "Raffee" again in the lobby of the courthouse on the day of Petitioner's preliminary examination. (Tr. IV, 626.) She since has seen him at a gas station at the corner of Franklin and Eastern. (Tr. IV, 627.) Price testified that until shortly before the shooting, Dorothy Brown's purse was flat, like it contained little. A short time before the shooting, Brown left the bar, returning with something in her purse. (Tr. IV, 628-29.)

Anthony Keith Jones, also known by friends as "Scarface," testified that he had been a friend of Petitioner's for a year or two. He, Petitioner, Robert Glass and Rolando Lesley went to So-So's on the night of the shooting. Jones testified that Petitioner's nickname was "D." (Tr. IV, 640.) The four traveled from Battle Creek in Petitioner's blue car. (Tr. IV, 637-38.) Jones saw Laura Dean and spoke with her. As he stood near the dance floor, he saw a man named "Way Out" standing on top of a table. "Way Out" struck the deceased in the face with a glass. (Tr. IV, 639.) A fight broke out and Petitioner, Glass and Lesley tried to break it up, but could not. (Tr. IV, 640, 642-43.) Jones began heading toward the front bar. He saw "Way Out" reach for something at his waist. (Tr. IV, 667.) He saw the deceased run away from the fight and get shot. He did not see the shooter, but the shots were fired a couple of seconds after he saw "Way Out" reach for his waist. (Tr. IV, 667.) The shots came from the rear of the bar, where "Way Out" was. Jones believed that "Way Out" was the person who fired the shots (Tr. IV, 670-71.) At the time the victim was shot,

- 13 -

Petitioner was near the front of the bar.  (Tr. IV, 655-56.)  Jones saw Petitioner and Lesley going out

the door, and he ran behind them.  (Tr. IV, 640.)  After they left the bar, the four went to the Holiday

Inn and spent the night.  (Tr. IV, 647.)  Jones denied seeing Laura Dean at the Holiday Inn after the

shooting.  Instead, he saw her at a different Holiday Inn a couple of weeks before the shooting.  (Tr.

IV, 648-49.)  Jones described Petitioner's hair as being long and combed back in waves, never in a

ponytail.  (Tr. IV, 659-60.)

Dr. Steven Cohle, an expert in forensic pathology testified regarding his post-mortem

examination of Christopher Rumbley.  Cohle testified that Rumbley had numerous external scrapes

on his left forearm and wrist, the top of the left shoulder, and the left thigh.  He also had a cut near

the hairline extending to the skull and an injury to the top of the head caused by a heavy blow with

a weapon such as the butt of a heavy gun, a baseball bat, a heavy bottle, or some similar object.  In

addition he had a gunshot wound entering the right chest that passed through the heart and other vital

organs.  (Tr. V, 694-95, 699.)  Rumbley bled to death from the gunshot wound, probably within

about three minutes.  (Tr. V, 696.)  Because no powder burns appeared on the skin and because of

the angle of trajectory, Rumbley had to have been shot at a distance of more than four feet, and either

the assailant had to have been standing on a table or the victim had to have been bent forward at a

significant angle.  (Tr. V, 695, 702-03.)  Rumbley also had numerous old scars consistent with a

history of fighting.  (Tr. V, 709.)  Cohle testified that if an assailant had been holding the collar of

the victim's shirt while firing a gun, gunpowder or soot residue would have been expected.  (Tr. V,

711-12.)

Crime scene technician Kathy Zemaitis testified that she arrived at the scene at

approximately 1:00 a.m. on the morning of November 7, 1991, just as the body was being removed.

(Tr. V, 715.)  She testified to the location of the body and of a cartridge casing, a fired bullet and a fully loaded fifteen-cartridge clip.  (Tr. V, 719-21.)   No fingerprints were recovered from the physical evidence.  (Tr. V, 730; Tr. VI, 850-51.)

Michigan State Police officer Gary Truszkowski testified as an expert in firearms and identification.  (Tr. V, 735.)  Both the fired bullet and the cartridge case were from a nine millimeter semiautomatic pistol.  (Tr. V, 736-37.)  He could not identify the manufacturer of the weapon that fired the cartridge.  (Tr. V, 739.)  The cartridges in the magazine clip came from several different cartridge manufacturers.  (Tr. V, 740-41.)  The magazine itself was from a Ruger P-85.  (Tr. V, 742, 746-47.)  Truszkowski testified that he could not determine where the gun was discharged from where the cartridge case was found.  (Tr. V, 743-44.)

Crime scene technician Sheila Hynes briefly testified, essentially corroborating the testimony of the other crime scene technician, Kathy Zemaitis.  (Tr. V, 751-61.)  Grand Rapids police officer Glen Bailey testified that he and his partner, Steve LeBreque, arrived at the scene less than one minute after receiving a dispatch call shortly after 1:00 a.m. on November 7, 1991.  (Tr. VI, 776.)  Bailey spoke with between five and fifteen witnesses.  The witnesses generally were uncooperative, and they avoided questioning by leaving.  (Tr. VI, 778.)  Bailey attempted first aid, but the victim appeared dead.  (Tr. VI, 778-79.)  Bailey testified that he put the ammunition clip back where witness Mack reported finding it.  (Tr. VI, 780.)

Jimmy Mack testified that he was a regular customer at So-So's and was present on the night of the killing.  Patrons were checked for weapons at the door. (Tr. VI, 784-85.)  He was dancing in the middle of the dance floor when he heard fighting or arguing, followed by gunshots. (Tr. VI, 785-86.)  He testified that the bullets came from the hallway area and came past him  (Tr.

VI, 800-801.)  Mack then dove under a table.  (Tr. VI, 787.)  He saw the victim who had been shot

in the leg and heard him say he had been hit.  (Tr. VI, 787.)  After he got up, Mack walked around

picking up money and things from the floor.  He found the ammunition clip under a napkin and gave

it to a police officer, upon the officer's request.  Mack watched the police officer put the clip in the

same place Mack told him he had found it.  (Tr. VI, 791-92.)  Mack attended the lineup but did not

identify Petitioner.  (Tr. VI, 797.)

       Robert Glass testified that he, Petitioner, "Tone" [Anthony Jones or "Scarface"] and

"Sean" drove to So-So's on November 6, 1991.  (Tr. VI, 812-14.)  Glass testified that he and

Petitioner, nicknamed "D," were best friends.  (Tr. VI, 813.)  According to Glass, Petitioner wore

his hair longish, in a wave going back, but he never pulled it into a ponytail all the time Glass had

known him.  (Tr. VI, 817-18.)  Glass testified that a drunk man began to argue with a man Glass

knew as "Way Out," beginning a fight.  (Tr. VI, 820-21.)  He, Petitioner, Tone and Sean approached

the fight.  (Tr. VI, 830-31.)  When the shooting began, Glass, Petitioner and others ran out of the bar.

(Tr. VI, 821.)  Glass was the first out and Petitioner was last.  (Tr. VI, 833.)  At trial, Glass could not

remember what he and Petitioner were wearing, though he testified before the grand jury that

Petitioner was wearing a dark blue Piston's starter jacket and matching cap.  (Tr. VI, 834-37.)  He

testified that Petitioner was not involved in the fight, that he did not see Petitioner with a gun that

night, and that he did not see Petitioner shoot anyone.  (Tr. VI, 841.)

       Rachel France testified that she went to So-So's at about 10:30 p.m. on November 6,

1991, together with her sister Tammy, Loquita Delridge, Cutina Edwards and Patricia Durr.  (Tr. VI,

852, 865.)  France was on the dance floor when a fight broke out.  (Tr. VI, 853-55.)  She left the

dance floor, thinking the fight involved her friends.  Before she got to the fight, she heard two or

- 16 -

three shots fired.  (Tr. VI, 857, 859.)  She did not see who was involved in the fight.  (Tr. VI, 859.)  After the shots, her cousin pulled her to the floor.  She got back up and saw people running for the door and a man lying on the floor.  (Tr. 860.)  She saw no one with a gun.  (Tr. VI, 861.)  She attended the lineup, but could recognize no one.  (Tr. VI, 861.)

Tammy France testified that she went to So-So's with her sister and a number of others on November 6, 1991.  (Tr. VI, 873.)  She was by the back door when the fight broke out. She saw a number of people watching the fight and then heard a couple of shots.  (Tr. VI, 875-76.) She saw someone wearing a long, black, leather coat run out the door at a time people were saying, "There they go running out the door."  (Tr. VI, 880.)  She attended the lineup, but was unable to identify anyone.  (Tr. VI, 879.)

Rolando DeSean Lesley, nicknamed "Sean," testified that he, Anthony Jones, Robert Glass and Petitioner, nicknamed "D," went to So-So's on the night in question. (Tr. VI, 888-89.) He saw a person known to him as "Way Out" in a fight with another man.  (Tr. VI, 896.)  He was standing near Jones, Glass and Petitioner, but he and Jones were closer to the fight.  (Tr. VI, 901.) Lesley testified that he saw "Way Out" hit the other person with an object that he assumed was a gun.  They fell to the floor and "Way Out" hit him again.   He moved away from the fight and heard shots.  (Tr. VI, 900, 915-16.)  He then ran out of the club.  (Tr. VI, 900.)  At the time of the incident, Petitioner wore his hair somewhat long and waved to the back.  He never saw Petitioner with his hair pulled back into a ponytail.  (Tr. VI, 902-04.)  He never heard anyone call Petitioner "Baby D."  (Tr. VI, 917.)

Sheilita Cox testified that she went to So-So's at about 11:30 p.m.  (Tr. VI, 921.)  She was sitting in a booth by the wall with Frank Sallie.  (Tr. VI, 923, 933.)  She heard a loud noise and

realized that there was a fight.  She saw hands going up and down and a person being beaten.  She then saw a hand come up with a gun.  She testified that she "yelled out that they have a gun."  (Tr. VI, 926.)  She was trying to run when she heard gunshots.  (Tr. VI, 926.)  She believed that at least two or three people were beating the victim.  (Tr. VI, 927.)  She attended the lineup, but was unable to identify anyone.  (Tr. VI, 932.)

Jamesia Robinson testified that she went to So-So's with her two cousins, Phillip Johnson and Barbara Keith.  (Tr. VI, 938.)  She was near the fight when it broke out, and she saw what looked like four people involved.  (Tr. VI, 942-43.)  She wanted to leave, but she could not get past the fight.  Someone told her to get down and she got under a table.  Then she heard three shots.  (Tr. VI, 943-45.)

Cutina Edwards testified that she went to the bar with Diane Watson and her brother Ernest Watson.  (Tr. VII, 956.)  She was on the dance floor when she became aware of three people fighting.  (Tr. VII, 957.)  She did not know the participants, but two of those involved were wearing long, black, leather coats and black cotton stocking caps.  (Tr. VII, 958-59, 969.)  They knocked over tables and people began to crowd around.  (Tr. VII, 961.)  She heard three gunshots, and she began to run toward the bathroom.  (Tr. VII, 962-63.)  She could not identify anyone at the lineup.  (Tr. VII, 963.)

Rochelle Edwards testified that on November 6, 1991, she went to So-So's with Carrie McIntosh and Claudette Bryan.  She was not checked for weapons when she arrived at about 11:00 p.m.  (Tr. VII, 975.)  She stood, as usual, by the second bar in the back.  (Tr. VII, 976.)  She was in the hallway when the fight broke out.  (Tr. VII, 978-79.)  She told her friends that two men were fighting, and then she heard someone yell that he had a gun.  She ran to the front door, and she

was going out the door when she heard the shots. (Tr. VII, 979-80.) She could not identify anyone involved in the fight. (Tr. VII, 986-87.)

Vonya Ware went to So-So's near closing time, 2:00 a.m. She asked the man at the door to page Conte. As she stood there, everyone ran to the front of the bar. She heard two shots and she ran by the pool table and went under the bar. (Tr. VII, 989, 992-93.) She did not see any guns that night and was unable to identify anyone at the lineup as having a gun. (Tr. VII, 994.) She did, however, identify Petitioner as being at the bar that night. (Tr. VII. 996.)

Shawnetta Chinn went to So-So's with her boyfriend, Michael Hernandez, at about 1:00 a.m. (Tr. VII, 1005.) Within fifteen minutes after she arrived, she saw the victim in a fight with two men, right in front of her table. (Tr. VII, 1005.) Eventually, about five or six men joined the fight. (Tr. VII, 1007.) After they had been fighting, a man dressed in a bright colored jacket held up a gun. She then heard three or four shots. (Tr. VII, 1005-06, 1009-10.) After she heard the shots, she got to the floor. (Tr. VII, 1012.) Because of the dark conditions, she could not identify anyone involved in the fight except the victim, Chris Rumbley. (Tr. VII, 1017.)

Grand Rapids Police Officer Bruce Weaver testified that he responded within a few seconds to a call received at approximately 1:05 a.m. on November 7, 1991, directing him to a large disturbance at So-So's. (Tr. VII, 1023-24.) When he arrived, approximately 40 or 50 people were outside the bar and leaving the area. (Tr. VII, 1023, 1028.) He was instructed by Lieutenant Fox to keep people inside the bar as much as possible and to take names. Individuals who would not give names and addresses would not be allowed to leave. He stood at one side of the entrance and Officer Tim Moore stood at the other side. Both took names and addresses. (Tr. VII, 1024.)

The next witness to testify was Patsy Price, a regular patron at So-So's. Price testified that she was at So-So's with her ex-boyfriend, Tony Hardin. (Tr. VII, 1030-31.) About three hours after she got to So-So's, she was sitting in front of the dance floor when she saw two men begin arguing. (Tr. VII, 1032, 1038.) She also saw two women beginning to argue. She began to dance, and approximately ten minutes later she heard gunshots. (Tr. VII, 1035.) She and her boyfriend got down on the floor. (Tr. VII, 1035-36.) She could not identify the men who were fighting. (Tr. VII, 1034.)

Dorothy Brown was recalled to the stand. She testified that she first met Rod Fee sometime in early 1992. (Tr. VII, 1059.) She had seen him on numerous occasions after the shooting, but never at So-So's (Tr. VII, 1056, 1060.) She acknowledged that Fee was similar in appearance to Petitioner, but she could easily tell the difference. She stated that the man she saw in So-So's on the night of the incident was Petitioner, not Rod Fee. Brown testified that she had never had any substantial relationship with Fee. (Tr. VII, 1056-58.)

Rod Fee testified that he was not at So-So's on the night of the shooting, though he had been at the bar on other occasions. (Tr. VII, 1066.) He was riding in a cab past So-So's on November 7, 1991, and saw the police in front of the bar. (Tr. VII, 1067.) During the week preceding his testimony, Fee became aware from an ex-girlfriend that the police were looking for him. (Tr. VII, 1067.) He spoke with police, explaining his whereabouts on the night of the shooting. (Tr. VII, 1068-69.) Fee testified that he had spent much of the evening at his girlfriend, Rebecca White's, house. He called a cab to go to So-So's. When he saw the police in front of So-So's, he went to another bar, Pazzazz. When he got to Pazzazz, he learned there had been a shooting at So-So's. (Tr. VII, 1069.) Fee stated that he did not know Petitioner, but he had seen him a couple of

times at Pazzazz and in jail in May 1992.  Others had commented to him that he and Petitioner looked like twins.  (Tr. VII, 1071-73.)  Fee testified that he had worn his hair in a pony tail since approximately 1986.  (Tr. VII, 1075.)  He stated that he had never had more than casual conversation with Dorothy Brown.  (VII, 1074-75.)

Patricia Durr testified that she wasn't wearing her glasses and was unable to recognize anyone.  (Tr. VII, 1107-1117.)  She could not identify anyone involved in the incident at the lineup, though she did identify Petitioner as someone she otherwise recognized.  (Tr. VII, 1115-16.)  She stated that after the shooting a man wearing a black coat, who had earlier danced with Rachel France, passed the gun to another.  (Tr. VII, 1119-20.)

Lester Barnett testified that he was on the dance floor at the time of the shooting.  (Tr. VII, 1125.)  He heard the argument between the victim and three other men.  (Tr. VII, 1128.)  He saw a man's hand come down with a gun and heard a shot.  (Tr. VII, 1128.)  He heard a total of three shots, but never saw the face of the shooter.  (Tr. VII, 1132-33.)  The shooter was over six feet tall, wearing a light-colored long shirt, and with closely cropped hair, or hair that was pulled back.  (Tr. VII, 1131-32.)

Lawrence Woods testified that he was the door man and bouncer at So-So's on the night of the shooting.  He used a metal detector to check all men, and more briefly checked women, looking into their purses.  (Tr. VII, 1137-38.)  Woods testified that he knew Rod Fee well as a regular patron of So-So's, but he did not know if Fee was in the bar on the evening of the shooting.  (Tr. VII, 1145-46.)

Gary Naves testified that he saw a six-foot-tall man with wavy hair and wearing a blue and red Pistons jacket run toward him immediately after the shots were fired.  (Tr. VIII, 1165-

66.)  He identified Petitioner both in the lineup and in court as looking similar to the man he saw running.  (Tr. VIII, 1168-69.)  At the time of the shooting, however, he thought he saw Rod Fee, and he could not be certain at trial whether it was Petitioner or Rod Fee.  (Tr. VIII, 1171-73.)

Latonia Thrash testified that she had known Petitioner all her life and lived around the corner from him.  (Tr. VIII, 1182-82.)  She reported that some period of years before the trial, Petitioner wore his hair in a "tail," which she described as a small braid in the back, which she distinguished from a pony tail.  (Tr. VIII, 1188-89.)  She stated that she could not be sure if he wore it that way at the time of the shooting, but she believed so.  (Tr. VIII, 1189-90.)

John Dent testified that he had known Petitioner since 1988.  According to Dent, a couple of days after the shooting, Petitioner told Dent he was being sought after for a murder he did not commit.  Petitioner told Dent that he had argued with a guy and had left the bar to go to the car.  When he left, he intended to shoot the guy.  (Tr. VIII, 1198-99.)  At that time, two men named "Yankee" and "Vamp" persuaded him not to shoot the man because he was in enough trouble.  Instead, Yankee got a girl to go in to lure the man outside and Yankee shot him.  (Tr. VIII, 1200.)  At the time, Petitioner had relatively short hair with a short braid in the back.  Yankee had the same haircut.  (Tr. VIII, 1214, 1218.)  Dent testified that he also had met Rod Fee, who looked like Petitioner.  (Tr. VIII, 1215-16.)

Battle Creek Police Officer Timothy Hurtt testified that he had known Diapolis Smith since 1985, and he had seen him on numerous occasions since then.  (Tr. VIII, 1222)  Before the summer of 1992, Petitioner wore his hair three to four inches long.  After the summer of 1992, he had a short cut with a small tail in the back.  (Tr. VIII, 1222-23.)  Hurtt testified that he also knew

Robert Glass, known as "Yankee."  Glass always had closely cut hair, and at no time had long hair or a tail.  (Tr. VIII, 1224-25.)

Willie Johnson testified that he was talking to Angie McIntosh when he saw a fight break out.  One man started arguing with another man sitting about ten or twelve feet away.  Shortly thereafter, five or six others joined the fight.  Johnson saw a pistol being pulled up and turned to leave.  (Tr. VIII, 1228-29.)  He could not recognize anyone involved, but some of the men had short leather coats and one had a long black trench coat. (Tr. VIII, 1229.)  He heard three shots as he was approaching the second bar.  (Tr. VIII, 1234.)

Anesia Jones testified that she saw a fight break out about fifteen feet away from her. The fight involved a number of people.  (Tr. VIII, 1248.)  She saw a hand go up with a gun and then saw two flashes.  She ran toward the back door, attempting to leave.  She recalled that the shooter was brown skinned, heavy set and wearing a red baseball cap with gold writing.  (Tr. VII, 1250, 1252.)

The prosecution introduced the testimony of Florence Davis, the operator of the Veterans Transportation Company.  Davis testified about the records of cab calls from 4:00 p.m. on November 6, 1991 to 4:00 a.m. on November 7, 1991.  The records showed that sometime within the twelve hour period, a cab picked up a rider at the address described by Rod Fee.  (Tr. IX, 1260-62, 1266.)  Veterans cab driver Karry Roland testified that, while drivers keep records of their fares, he no longer had the records from November 6-7, 1991.  (Tr. IX, 1269.)

Naeem Wahid testified that he arrived at So-So's, where he worked as a bouncer, at 10:00 p.m. on the night of the shooting.  When he heard the fight begin, he moved from the back of the bar toward the fight.  He saw a bunch of people jumping on one person.  He began trying to

- 23 -

separate the fighters.  He pulled one man off the fight.  (Tr. IX, 1271-73.)  As he turned, he saw a gun being swung downward, as if to strike someone.  He yelled out, "He got a gun."  (Tr. IX, 1274-75.)  He was right next to the person and identified Petitioner as the person with the gun.  (Tr. IX, 1275-76.)  Wahid yelled out the warning about the gun and dove away from Petitioner.  As he did so, he was struck with a bullet in the leg.  (Tr. IX, 1277.)  He described the gun as being black with white or gray on the side.  He saw only the one gun that night.  (Tr. IX, 1277.)  He described Petitioner as wearing a blue sports jacket with red writing on the back and wearing his hair slicked back with a ponytail.  (Tr. IX, 1278.)  He identified Petitioner at the lineup and at trial.  (Tr. IX, 1279.)  Wahid testified that he knew Rod Fee, that he had seen him on five or six occasions and that he easily could tell them apart.  (Tr. IX, 1281.)  He testified, however, that he did not know if Fee was at So-So's on the night of the shooting.  (Tr. IX, 1283.)  Wahid could not identify any other person involved in the fight and had no memory of what people were wearing.  (Tr. IX, 1286, 1288.)

Anthony Hardin testified that he knew Chris Rumbley and saw him argue with Petitioner and then separate.  (Tr. IX, 1310-11.)  Hardin danced for awhile, mingled and spoke with various people.  (Tr. IX, 1311.)  He was speaking with his sister when he noticed Rumbley and Petitioner arguing again.  He saw Petitioner hit Rumbley over the head with a gun.  (Tr. IX, 1312.)  Rumbley tried to come back at Petitioner and a friend of Petitioner's appeared to pull him back.  (Tr. IX, 1313.)  Various other people came over and began yelling, and Hardin could not see who was striking whom.  (Tr. IX, 1312-13.)  Hardin then saw Petitioner point the gun at Rumbley's midsection and fire it.  (Tr. IX, 1313.)  Hardin, his sister, Leonora Jones, and Patsy Price all dropped to the floor.  (Tr. IX, 1314.)  Hardin heard additional shots, but he does not know how many.  (Tr. IX, 1314.)  He had noticed Petitioner earlier in the evening when his sister and her friends

commented that Petitioner was nice looking and that they would like to meet him. (Tr. IX, 1317.) Hardin testified that Petitioner's hair was combed back into a braid. (Tr. IX, 1318-19.) He identified Petitioner at the lineup as well as at trial. (Tr. IX, 1324.) Hardin testified that the shooter was wearing a full-length coat. (Tr. IX, 1345.)

Leonora Jones testified that she was with her brother and Patsy Price at So-So's on the evening of the shooting. (Tr. IX, 1366.) She noticed Petitioner and some other men because Petitioner was good looking and had nice hair, drawn back into a pony tail. (Tr. IX, 1366, 1371.) Petitioner was wearing a gray sweatshirt with a hood, covered by a white or gray jacket. (Tr. IX, 1372.) The men did not arrive until a short time before they began to fight with Chris Rumbley. (Tr. IX, 1366-67.) She saw Rumbley hit with bottles and saw Petitioner hit him with a gun. Less than a minute after she saw the gun, she heard a shot. Her brother then pulled her to the floor. (Tr. IX, 1368.) She testified that Petitioner appeared to leave the bar and then come back shooting. (Tr. IX, 1377-78.) She identified Petitioner as the shooter both at the lineup and at trial. (Tr. IX, 1379.)

Grand Rapids Police Detective Thomas Lyzenga testified that he was the chief investigator of the shooting at So-So's. (Tr. X, 1414-15.) He responded to the scene after being awakened by officers sometime after 1:00 a.m. (Tr. X, 1416.) When he interviewed Tonya Griver, Katherine Brown and Dorothy Brown on January 22, 1992, he first heard the name "Baby D." (Tr. X, 1418.) He never heard the name "Rod Fee" until trial. (Tr. X, 1420.) He had heard Miss Price say the name "Roffee" before. (Tr. X, 1420.) Lyzenga testified that he never found the weapon and that it was not possible to track a particular Ruger P85 from the clip, the cartridge case or the spent bullets. (Tr. X, 1427-28.) At the time Petitioner was booked for the shooting, February 12, 1992, he had long, straight hair. Six days later, at the arraignment, he had shaved his hair down to the skin.

- 25 -

(Tr. X, 1430-31.) On July 16, 1992, Lyzenga heard the name ""Way Out"" for the first time from defense counsel. The name came up again on July 23, 1992 at the grand jury proceedings through witnesses Robert Glass, Rolando Lesley and Anthony Jones. (Tr. X, 1438, 1442.) Lyzenga testified that he explored all records, interviewed officers and posted notices, seeking information about an individual named ""Way Out"." He found no information about such an individual. (Tr. X, 1442-43.) Lyzenga introduced the identification cards from the witnesses identifying Petitioner at the lineup. (Tr. X, 1447-49.) Defense counsel cross-examined Lyzenga regarding threats he made to Katherine Brown regarding her sister Dorothy Brown's potential to be charged as an accessory after the fact if she continued to be uncooperative in identifying Petitioner. (Tr. X, 1464-1468.) Lyzenga acknowledged that Katherine Brown had not identified Petitioner at the lineup. (Tr. X, 1468.) He also acknowledged that police had not heard the name Anthony Hardin until several months into the investigation. (Tr. X, 1472, 1476.)

Grand Rapid Police Detective Kenneth Kooistra testified that after failing to identify Petitioner at the lineup, and while he was being driven home, Ernest Watson told Kooistra that he had recognized Petitioner as the shooter because of the back of his head. (Tr. X, 1478-79.) Officer Timothy Williams testified that the name "Rod Fee" did not come up in the investigation until trial. (Tr. X, 1482.) He summarized the varying identifications of the witnesses at the lineup. (Tr. X, 1490-1501.) The prosecution then rested its case. (Tr. X, 1501.)

The defense first called Kent County Sheriff's Department employee Berendina Emery, who testified that according to jail records, Petitioner and Rod Fee were both housed at the Kent County Jail during a period from May 27, 1992 through July 2, 1992. (Tr. X, 1524.) Petitioner's aunt, Linda Griffin, testified that she had seen Petitioner several times each week in the

fall of 1991 and had known him his whole life.  She identified certain pictures taken of Petitioner at her son's birthday party on October 20, 1991.  She stated that the photographs were an accurate reflection of the way Petitioner wore his hair at that time and that she had never seen Petitioner wear his hair in a pony tail or braid.  (Tr. X, 1526-31.)

Monica Lee, Petitioner's girlfriend from 1989 to 1992, testified that she was very familiar with Petitioner's hair in 1991, because she had styled it.  According to Lee, Petitioner wore his hair in a "finger wave," but never in a pony tail.  Lee testified that it was not possible to wear hair in finger waves and in a pony tail simultaneously.  (Tr. X, 1534-35.)  In November 1991, Petitioner had a mustache and a small beard on the chin.  (Tr. X, 1536, 37.)  Lee testified that she lived with Petitioner and had never seen him in a Pistons, Duke or any other blue jacket.  (Tr. X, 1535, 1540.) She testified that the only leather coat she had seen Petitioner wear was the waist-length leather jacket she gave him for Christmas in 1989 or 1990.  (Tr. X, 1545.)

Petitioner testified on his own behalf.  He testified that on November 6, 1991, he, Robert Glass, Rolando Lesley and Tony Jones drove from Battle Creek to So-So's.  Petitioner drove a 1975 dark blue Buick four-door.  (Tr. X, 1548-49.  They arrived shortly after midnight and were searched at the door for weapons.  (Tr. X, 1549.)  He saw Dorothy Brown, whom he had met two weeks before at City Lights, and a man he knew by the name ""Way Out"," whom he had met a week or two earlier on Prospect Street.  (Tr. X, 1550-51.)  Petitioner witnessed a fight break out near the rear bar.  The fighters were "Way Out" and a man he did not know.  Petitioner was on the dance floor when he saw "Way Out" hit the other man in the head with a glass.  (Tr. X, 1552.)  Petitioner tried to see what was happening and was moving through people when he heard shots.  (Tr. X, 1554-55.)  He saw somebody fall in the area near the restroom.  (Tr. X, 1555.)  He and others tried to move

toward the front exit.  Many people were falling and running.  Once he was outside the bar, he stopped a girl and asked if she knew who had done the shooting.  When she said no, he and his friends got into the car and drove to the Holiday Inn, where they were staying.  (Tr. X, 1556.) Petitioner testified that in November 1991, he wore his hair in finger waves, and he never wore a pony tail  (Tr. X, 1557.)  He also had a mustache and goatee, as shown in his aunt's pictures, although he had shaved the middle of the beard.  (Tr. X, 1561-62.)  By February 1992, when he was arrested, his hair was quite a bit longer.  (Tr. X, 1558.)  After coming to jail, he cut his hair because it had been damaged by a permanent wave done the week before his arrest.  (Tr. X, 1558.)  Petitioner testified that he never had a conversation about the crime with John Dent because he had never met the man.  (Tr. X, 1560.)  He testified that he never owned a Pistons or Duke jacket and was not a fan of those teams.  (Tr. X, 1563.)  Petitioner testified that he had called Dorothy Brown on the telephone sometime before the night of the shooting.  In the days just after the shooting, Dorothy Brown called Petitioner's beeper and he returned her call.  (Tr. X, 1557-58, 1667-68.)  The defense then rested.  (Tr. XI, 1592.)

At the conclusion of trial, on October 5, 1993, after four days of deliberations, the jury found Petitioner guilty of second-degree murder and felony firearm, and not guilty on the remaining two counts.  (Tr. XII, 1733-36.)   On November 29, 1993, Petitioner was sentenced to life imprisonment.  (Sentencing Transcript, ("S. Tr."), 17, docket #25.)

### B.  Direct Appeal

On February 14, 1994, Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on July 12, 1995, raised seventeen issues.  Petitioner filed a pro per brief raising four supplemental issues.  (See Def.-Appellant's Br. on Appeal, docket

# 37.)  Petitioner filed a motion to remand, which was initially denied by the court of appeals on October 10, 1995.  (See 10/10/95 Mich. Ct. App. Ord., docket # 37.)  On May 14, 1997, on its own motion, the court of appeals remanded the case for an evidentiary hearing on Petitioner's claim that he had been denied an impartial jury.  (See 5/14/97 Mich. Ct. App. Ord., docket # 37.)  The Kent County Circuit Court, through successor judge Paul J. Sullivan, held a lengthy hearing, including expert testimony, about minority underrepresentation in the jury array.  (4/27/98 Mot. Tr., docket # 22.)  On June 8, 1998, Judge Sullivan issued findings of fact and an opinion.  He found that blacks were consistently underrepresented in Kent County jury venires for all panels during the jury term. He concluded, however, that such underrepresentation had not been shown to be systematic.  (See 6/8/98 Cir. Ct. Op., docket # 38.)  In an unpublished opinion issued after remand, the Michigan Court of Appeals reversed the circuit court, concluding that Petitioner had demonstrated that the jury venire  systematically underrepresented black jurors and remanded the case for a new trial with proper jury selection procedures.  (See 5/7/99 Mich. Ct. App. Opinion ("MCOA Op."), docket ## 37, 38.)

The prosecutor filed a motion for leave to appeal to the Michigan Supreme Court. By order entered October 6, 1999, the Michigan Supreme Court granted leave to appeal.  (See Mich. Ord., docket # 38.)  On July 28, 2000, the Supreme Court reversed the court of appeals, holding that Petitioner had failed to demonstrate either an unfair and unreasonable underrepresentation of African American jurors in the venire or that such underrepresentation was systematic.  The court therefore remanded the case to the Michigan Court of Appeals for consideration of the remaining issues on appeal. *People v. Smith*, 463 Mich. 199, 615 N.W.2d 1 (2000).

- 29 -

On remand from the supreme court, the court of appeals considered the remaining eighteen issues not considered in its first decision and affirmed the conviction and sentence.  (See 2/27/01 MCOA Op., docket # 37.)  Petitioner sought rehearing, which was denied on April 9, 2001. (See 4/9/01 MCOA Ord., docket # 37.)  Petitioner filed a delayed application for leave to appeal to the Michigan Supreme Court, which was denied on February 4, 2002.  Petitioner filed the instant petition on February 5, 2003.

### Discussion

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001), cert. denied, 536 U.S. 911 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

*Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is

"limited to an examination of the legal landscape as it would have appeared to the Michigan state

courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."

*Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that

contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are

materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a

different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent

but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably

refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing

*Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429

(6th Cir.), *cert. denied*, 124 S. Ct. 535 (2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; accord

*Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established

federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated

to conduct an independent review to determine if the state court's result is contrary to federal law,

unreasonably applies clearly established law, or is based on an unreasonable determination of the

facts in light of the evidence presented.  *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d

721, 727 (6th Cir. 2003).  Where the circumstances suggest that the state court actually considered the issue, the review is not de novo.  *Onifer*, 255 F.3d at 316.  The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  Harris, 212 F.3d at 943.  However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer.  In such circumstances, the court conducts de novo review.  *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 123 S. Ct. 2527, 2542 (2003) (reviewing habeas issue de novo where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established de novo standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1);  *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).  Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## I.     Jury Underrepresentation

In his first ground for habeas relief, Petitioner argues that he was denied his rights under the Sixth and Fourteenth Amendments to a jury drawn from a "fair cross section" of the

community.  He asserts that there existed systematic underrepresentation of African-Americans on Kent County juries at the time of jury selection in his case, resulting in his being tried by an all-white jury.  The record reflects that a total of 37 people were considered on voir dire before a jury of 14 was seated in the case.  All of those 37 were white.  During jury selection, seven jurors were dismissed for cause, four were dismissed on peremptory challenges by the prosecution, and twelve were dismissed on peremptory challenges by the defense.  (Tr. I, 147-48.)

At an evidentiary hearing conducted on remand from the Michigan Court of Appeals, Petitioner presented a substantial body of evidence.[2]  First, Kent County Circuit Court Administrator Kim Foster testified about the selection of jury venires at the time Petitioner's jury was drawn. Foster testified that the original list of approximately 350,000 prospective jurors was drawn from the database of driver's licenses and identification cards maintained by the Michigan Secretary of State. (2/22/98 Mot. Tr., 14-16.)  A key number was used to select every "nth" name from the list, in order to reduce the number of names to 50,000.  (2/22/98 Mot. Tr., 17.)  Notices were sent out by mail, and approximately 5% were returned as undeliverable.  An additional fifteen to twenty percent generated no response.  A second letter was mailed out to non-responders, which generally received about a 50% return rate.  (2/22/98 Mot. Tr., 18-19.)  An order to show cause then was mailed to the individuals who continued not to respond.  (2/22/98 Mot. Tr., 19-20.)  It was unknown how many

---

[2]The evidentiary hearing was begun on February 2, 1998.  Appellants sought additional time to produce additional testimony and evidence, and the hearing was continued to April 27, 1998.  (4/27/98 Mot. Tr., 4.)  In the materials produced by Respondent under Rule 5, RULES GOVERNING § 2254 CASES, the government has not provided a transcript of the first day of hearing.  Because the Court concludes that the determinations made by the Michigan Supreme Court were not unreasonable, and because the expert testimony was accepted as fact by the Michigan courts, this Court will accept as accurate the version of the facts and transcript references for the February 2, 1998 hearing as provided by Petitioner.

served with show-cause orders failed to appear.  (2/22/98 Mot. Tr., 48.)  At the end of the process, the responding potential jurors were placed on the qualified jurors list.  (2/22/98 Mot. Tr., 20.)

If a person responding to a questionnaire claimed a statutory exemption, the person was not placed on the potential juror list. The county did some checking of exemption claims, depending on resources, but for the most part relied on the person's word.  (2/22/98 Mot. Tr., 21.) Neither the Secretary of State list nor the qualified jurors list contained the race of the person being kept or excused.  (2/22/98 Mot. Tr., 22.)

A "second list" was selected randomly from the qualified jurors list.  (2/22/98 Mot. Tr., 21.)  If a notice to appear sent to a juror was not delivered, the court took no action.  (2/22/98 Mot. Tr., 25.)  If a person who received a notice failed to show up, a telephone call was attempted. If the person had no telephone, a letter "generally" was sent.  If no response was received, no further action was taken.  (2/22/98 Mot. Tr., 26-27.)

Prior to October 1, 1993, district court jurors were selected first from the potential juror list.  Only after district court lists were selected were circuit court jurors selected.  (2/22/98 Mot. Tr., 27-31.)  Petitioner's jury selection began September 13, 1993.  The juror list for his jury panel would have been selected in May or June of 1992. (2/22/98 Mot. Tr., 28.)  Foster then testified about the reason the October 1, 1993, change was made in the manner jurors were selected:

Q      Okay.  Now, with respect to picking circuit jurors first rather than the procedure before, picking district jurors first, why was that change made?

A      The belief was that the respective districts essentially swallowed up most of the minority jurors, and Circuit Court was essentially left with whatever was left, which did not represent the entire county, it generally just – it represented certain portions of the county.

- 34 -

(2/22/98 Mot. Tr., 30.) Foster also testified that during the time period in issue, the visible number of minority jurors appeared low.

Since 1993, the underrepresentation on circuit jury lists has improved. (2/22/98 Mot. Tr., 53.) After that time, people would seek to be excused for non-statutory reasons, such as inability to get a ride or child care, but such requests were considered on a case-by-case basis. (2/22/98 Mot. Tr., 28-29.) Foster also testified that the court made no corrective efforts to compensate for certain potential problems:

> Q   Just very quickly. We've submitted documents to the court, statistics indicated that black citizens are convicted of felonies proportionately more than white citizens, and I am wondering if, after excusing those who are under sentence for felony, you took any steps to correct any under-representation of minorities that the not under sentence but for felony rule might impose? Did you take any corrective efforts to say go out and find more minorities to compensate for those who had been excused for being under sentence for felonies?
>
> A   During each month, no.
>
> Q   No. And if it turned out, from one of our subsequent experts, that members of minority groups are less likely to have a car, more likely to be unmarried mothers who can't find babysitters, and if that had an effect on the number of minorities to the pool to take into account those excused because of the various excuses like no car, no ride, no babysitter?
>
> A   I have no way of determining a race at the time those are being dealt with, as far as excuse for transportation, but to answer your question, is now once the month – those excuses are dealt with once an individual is summonsed to jury duty for a given month. Generally no further action is taken dealing with an excuse. We plan on, in requesting the numbers, or numbers of summonses for a month, that there will be some of those requests for excuse. So we always request enough people to be there.

(2/22/98 Mot. Tr., 40-41.)

Dr. Michael Stoline testified at the first hearing regarding the racial composition of various Kent County census tracks and the composition of jurors appearing from those districts for the time period of October 1, 1993 to September 30, 1994. He found statistically significant underrepresentation in twelve of the 35 tracts with a high black population. Of the tracts with low black population, thirteen of the 34 were overrepresented and only five were underrepresented. (2/22/98 Mot. Tr., 72-73.) He also found that the extent of the deviation was larger and more consistently pointed away from blacks than could be accounted for by chance. (2/22/98 Mot. Tr., 81-82.) At the second hearing, Stoline testified to the time period between April 1993 and October 1993. During that time period, the overall underrepresentation of black prospective jurors was 18 percent, but in the last monthly period, the period during which Petitioner's jury was selected, the underrepresentation was 34.8 percent. (4/27/98 Mot. Tr., 10-11.) In actual numbers of jurors, the underrepresentation would yield approximately four fewer potential black jurors. (4/27/98 Tr., 12-14.) Stoline testified that he did not test for the statistical significance of the number. (4/27/98 Tr., 15-17.) He testified, however, that

> [T]here seems to be an under-represent – the possibility of under-representation of blacks in the composition of the Kent County jury lists in both periods of time, and the essential cause, in my view, from the analyses reported in Table 1, is that there's a tendency for more jurors to be selected from those Kent County census tracts that contain more proportionate white adults and fewer jurors selected from those Kent County census tracts that contain relatively fewer adult blacks . . . .

(4/27/98 Tr., 18.)

Kent County Public Defender Richard Hillary testified that in his experience as director of the Defender's Office, he had handled more than 130 trials. (2/22/98 Mot. Tr., 129.) He

testified that in 1992 or 1993, the Kent County Bar Association[3] formed the Jury Minority Representation Committee, which, in approximately 1994, recommended changes that were adopted by the court. (2/22/98 Mot. Tr., 130, 133-35.) Those changes resulted in a noticeable increase in the numbers of minority jurors who appeared. (2/22/98 Mot. Tr., 135.) Hillary also testified that after consideration, the committee also concluded that the practice of removing district court jurors from the pool caused too few minority residents to appear on circuit court juries. (2/22/98 Mot. Tr., 135-36.)

Kurt Metzger of Wayne State University testified as an expert in demographics and surveying techniques. (2/22/98 Mot. Tr., 147.) He testified that surveys routinely undercount African-Americans, renters, unmarried persons, people who move, and those in poorer housing. The problem is exacerbated when the government is involved. (2/22/98 Mot. Tr., 148-49.) He also testified that the same types of problems that keep people from jobs would keep them from jury service: transportation problems, single-parent households, and child-care problems. (2/22/98 Mot. Tr., 154-55.) He testified that if people could use the excuse of having no ride or babysitter, the excuse would introduce an element of non-randomness into the selection process, and statistics show that such an element would have a disproportionate effect on the presence of black persons on juries. (2/22/98 Mot. Tr., 162-64.)

In a written opinion issued after the taking of testimony, the circuit court concluded that Petitioner had demonstrated that the representation of African-Americans in venires from which juries were selected was not fair and reasonable in relation to the number of such persons in the community. The court concluded, however, that Petitioner had failed to demonstrate that the

___

[3] The proper name of the organization is "The Grand Rapids Bar Association."

- 37 -

underrepresentation was systematic.  (6/8/98 Cir. Ct. Op., docket # 38.)  The Michigan Court of Appeals reversed, finding systematic underrepresentation.  (5/7/99 MCOA Op., docket # 38.)  In a published opinion, the Michigan Supreme Court  reversed the Michigan Court of Appeals. *Smith*, 463 Mich. 199, 615 N.W.2d 1.  The supreme court expressed skepticism as to whether Petitioner had demonstrated underrepresentation of African Americans in the jury venire. *Smith*, 463 Mich. at 204-05, 615 N.W.2d at 3.  Assuming the underrepresentation to exist, however, the court found that Petitioner had failed to demonstrate that such underrepresentation was systematic. *Id.*, 463 Mich. at 205-06, 615 N.W.2d at 3-4.

The Sixth Amendment guarantees "the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed."  This right to an impartial jury includes the right to a jury drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 526, 530 (1975). As the Supreme Court has emphasized, however, there is "no requirement that petit juries actually chosen must mirror the community."  Id. at 538.  "Defendants are not entitled to a jury of any particular composition, . . . but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.* (citations omitted).

In order to establish a prima facie violation of the fair-cross-section requirement, a criminal defendant must show three things:  (1) that the group alleged to be excluded is a distinctive group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the under-representation is due to a systematic exclusion of the group in the jury selection

- 38 -

process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *United States v. Forest*, 355 F.3d 942, 953-54 (6th Cir. 2004).

The Michigan Supreme Court carefully applied the Duren standard to the instant case:

The question presented in this case is whether Kent County's former system of selecting jurors denied defendant his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community. To establish a prima facie violation of the fair cross-section requirement, a defendant must show that a distinctive group was underrepresented in his venire or jury pool, and that the underrepresentation was the result of systematic exclusion of the group from the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979). We hold that defendant was not denied this right because, although we grant him the benefit of the doubt on unfair and unreasonable underrepresentation, he has not shown systematic exclusion. Accordingly, we reverse the decision of the Court of Appeals and remand this case to the Court of Appeals for consideration of defendant's remaining issues.

The United States Supreme Court has not specified the preferred method for measuring whether representation of a distinctive group in the jury pool is fair and reasonable. See Detre, note, *A proposal for measuring underrepresentation in the composition of the jury wheel*, 103 Yale L J 1913, 1918-1920 (1994). Since *Duren*, the lower federal courts have applied three different methods of measuring fair and reasonable representation, known as the absolute disparity test, the comparative disparity test, and the standard deviation test. *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (C.A.3, 1992). Each of these tests, however, has been criticized. For example, in cases where the members of the distinctive group comprise a small percentage of those eligible for jury service, the absolute disparity test produces questionable results. *See United States v. Jackman*, 46 F.3d 1240, 1247 (C.A.2, 1995). Likewise, most courts have rejected the comparative disparity analysis because when the distinctive group's population is small, a small change in the jury pool distorts the proportional representation. *See United States v. Royal*, 174 F.3d 1, 8 (C.A.1, 1999). Finally, courts have applied a standard deviation analysis in Fourteenth Amendment cases, but not typically in Sixth Amendment cases. Detre, *supra* at 1922-1926. Some courts have used standard deviation analyses, *see Jackman, supra*; *Ramseur, supra*, but "no court in the country has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *United States v. Rioux*, 97 F.3d 648, 655 (C.A.2, 1996).

We thus consider all these approaches to measuring whether representation was fair and reasonable, and conclude that no individual method should be used exclusive of the others. Accordingly, we adopt a case-by-case approach. Provided

that the parties proffer sufficient evidence, courts should consider the results of all the tests in determining whether representation was fair and reasonable.

In this case, defendant presented some evidence of a disparity between the number of jury-eligible African-Americans and the actual number of African-American prospective jurors selected to the Kent County Circuit Court jury pool list. However, defendant's statistical evidence failed to establish a legally significant disparity under either the absolute or comparative disparity tests. Nevertheless, rather than leaving the possibility of systematic exclusion unreviewed solely on the basis of defendant's failure to establish underrepresentation, we give the defendant the benefit of the doubt on underrepresentation and proceed to the third prong of the Duren analysis.

II

Assuming defendant has satisfied the first two prongs of the Duren analysis, defendant must still show that the underrepresentation of African-American jurors was systematic, "that is, inherent in the particular jury-selection process utilized." *Duren*, *supra* at 366, 99 S. Ct. 664. We agree with our concurring colleague that defendant has not shown a systematic exclusion of African-Americans from the Kent County Circuit Court jury pool.

We further agree with our concurring colleague that defendant has not shown how the alleged siphoning of African-American jurors to district courts affected the circuit court jury pool. The record does not disclose whether the district court jury pools contained more, fewer, or approximately the same percentage of minority jurors as the circuit court jury pool. Defendant has simply failed to carry his burden of proof in this regard.

We also agree with our concurring colleague that the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African-Americans. The Sixth Amendment does not require Kent County to counteract these factors. *United States v. Purdy*, 946 F. Supp. 1094, 1104 (D. Conn., 1996).

Finally, even presuming that defendant can rely exclusively on statistics, he has not made the requisite showing in this case. In *Duren*, the Court noted that the defendant proved that a large discrepancy occurred in every weekly venire for approximately one year. *Duren*, *supra* at 366, 99 S. Ct. 664. Here, while defendant's proof may satisfy any duration requirement, the disparities over that time fell far short of those in *Duren*. Defendant did not demonstrate unfair and unreasonable underrepresentation under the disparity analyses. We therefore conclude that

defendant has not shown a systematic exclusion of African-Americans for the Kent County Circuit Court jury pool.

*People v. Smith*, 463 Mich. 199, 204, 615 N.W.2d 1, 2-4 (Mich. 2000) (footnotes omitted).

As the Michigan Supreme Court noted, the United States Supreme Court has not conclusively decided the standard by which underrepresentation should be measured. The Michigan Supreme Court's consideration of all three of the tests applied by lower federal courts therefore does not constitute an unreasonable application of Duren. The court correctly noted that the disparities at issue in the instant case were far more modest than those at issue in Duren.

Moreover, the state court's determination that Petitioner had failed to show that any underrepresentation was systematic also was not unreasonable. Although the scientific witnesses testified that the statistical occurrence of fewer African-Americans was not random, the witnesses failed to provide testimony that any disparity was caused by the "systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364. As the Michigan Supreme Court noted, the Supreme Court never has held that the Constitution requires the state to counteract the influence of social and economic factors that may affect juror participation. *See United States v. Craft*, No. 97-5898, 1998 WL 702348, at * 3 (6th Cir. Sept. 24, 1998) (systematic exclusion requires "evidence that a racially unbalanced jury pool . . . resulted from the very methods employed to select the jurors used to decide federal cases in the district); *Polk v. Hunt*, No. 95-5323, 1996 WL 47110, at * 2 (6th Cir. Feb. 5, 1996) (holding that exclusion is not systematic "if it is gathered without active discrimination") (citing *United States v. Cecil*, 836 F.2d 1431, 1445 (4th Cir. 1988)); *United States v. Purdy*, 946 F. Supp. 1094, 1104 (D. Conn. 1996). Although Petitioner presented testimony that the selection of district court juries before circuit court juries possibly affected the racial makeup of

the pool of circuit court jurors, he did not present more conclusive evidence and did not provide evidence of any disparity in the proportion of district court jurors drawn in the Grand Rapids district court as opposed to the other district courts in the circuit.  (See 6/8/98 Cir. Ct. Op., docket # 38.) Indeed, Petitioner himself presented evidence that a number of social and economic factors were likely to have influenced the responses and participation of potential jurors.  In sum, Petitioner himself presented more than one explanation of statistical disparities, only one of which was evidence of arguably systematic exclusion of the group attributable to the jury selection process.  As a consequence, the Michigan Supreme Court's determination did not constitute an unreasonable application of established United States Supreme Court precedent.

## II.      Exclusion of Evidence of Police Threat

Petitioner argues that his right of confrontation and his right to present a defense were unconstitutionally hampered by the trial court's limitations on defense questioning.  Specifically, Petitioner contends that he was not permitted to cross-examine Katherine Brown about her conflicting identifications of Petitioner: from being unable to identify Petitioner at the lineup, to remembering at the preliminary examination that she saw Petitioner fight with the decedent, to testifying at trial that she saw Petitioner with a gun.  Specifically, Petitioner wanted to ask Katherine Brown about a threat made by Detective Lyzenga against her sister, Dorothy Brown:

> Q      All right.  And were you aware that Detective Lyzenga had told Dorothy that during her interview that she was going to be in some kind of trouble, did you become aware of that?
>
> MR. VANDERMOLEN:  Your Honor, I'm going to object to whatever statement, if there was any, was made – wasn't made to this witness and seems out of her ability to know, and that would be hearsay anyway.
>
> MR. PLASZCZAK:  I believe she may answer if she knows, your Honor.

THE COURT:  It sounds like hearsay to me, unless there's some exception to it.  I mean, the conversation between Lyzenga and her sister Dorothy.  So I'd sustain the objection.

(Tr. II, 249.)

Respondent asserts that the claim is procedurally defaulted because Petitioner failed to preserve the issue by making a sufficient offer of proof.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  The Sixth Circuit applies a four-part test to determine whether a claim is procedurally defaulted: (1) the court must first determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must decide whether the state courts actually enforced the state procedural rule; (3) the default must be an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim; and (4) if the foregoing are met, the petitioner must demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001) (citing *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lancaster*, 324 F.3d at 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001), *cert. denied*, 535 U.S. 940 (2002); *Patterson v. Haskins*, 316 F.3d 596, 604 (6th Cir. 2003).  To determine whether Petitioner has been denied relief based on a procedural default, we look to the last "reasoned judgment rejecting the [federal] claim."  *Ylst*, 501 U.S. at 803.  The doctrine is applicable if "the last state court to review [the prisoner's] conviction 'clearly and expressly' relied on [the prisoner's] procedural default in its decision affirming Petitioner's conviction."  *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994).  There may be an

"exceptional case in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 382 (2002). A petitioner may also excuse a default by making a colorable claim of innocence; that is, he has shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Murray v. Carrier*, 477 U.S. 478, 495 (1986)). This exception is reserved for a very narrow class of cases, based on a claim of "new reliable evidence." *Schlup*, 513 U.S. at 315, 324.

Here, the court of appeals concluded that Petitioner had waived the objection because he failed to make an offer of proof to provide the reviewing court with the information it needed to evaluate the claim of error. (MCOA Op., at 2-3.) As a consequence, the court reviewed the claim only for plain error affecting substantial rights. Id.

A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). Although the Michigan courts have required offers of proof in certain circumstances, ordinarily such offers of proof are required when a court has sustained an objection and a party seeks to demonstrate a basis for admissibility that may not be apparent from the record. *See Orlich v. Buxton*, 22 Mich. App. 96, 100, 177 N.W.2d 184 (1970). It is not entirely clear whether the rule was sufficiently "regularly followed" in circumstances similar to this case. It therefore is questionable whether the rule as applied may be considered an adequate and independent state ground. As a result, the question of procedural default presents a complicated question of Michigan law. Where the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that

- 44 -

there was no procedural default or that Petitioner could show cause and prejudice for that default. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Cone v. Bell*, 243 F.3d 961, 971 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 685 (2002); *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).  The Court therefore will proceed directly to the merits of Petitioner's claim.

Petitioner's constitutional claim rests on the inherent right to present a defense protected by the Confrontation Clause the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment.  The Supreme Court has determined that a criminal defendant has the right to a "meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984).  The right is derived from the Sixth Amendment rights to compel and confront witnesses and from the Due Process Clause of the Fourteenth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process law.").  The Supreme Court, however,  repeatedly has recognized that the right to present a defense is subject to reasonable restrictions.  *See United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (the Sixth Amendment does not confer on the accused an "unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers*, 410 U.S. at 295; *see also Wong v. Money*, 142 F.3d 313, 325 (6th Cir. 1998).  The right to present relevant evidence during cross-examination "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295; *accord Rock*, 483 U.S. at 55 ("The right to present relevant testimony is not without limitation.").

- 45 -

As set forth in the description of facts and as noted in the Michigan Court of Appeals decision, the limitations imposed on the questioning of Katherine Brown were grounded in the basic evidentiary rules governing hearsay testimony.  Petitioner had ample opportunity and exercised that opportunity to extensively cross-examine Katherine Brown about the contradictions in her identifications.  (See Tr. II, 234-265.)  This opportunity for examination alone ensured Petitioner's right of confrontation.  *See Trombetta*, 467 U.S. at 485.  In addition, Petitioner cross-examined Detective Lyzenga, who acknowledged that he had told Katherine Brown that her sister could be charged as an accessory for not cooperating.  (Tr. X, 1465-68.)  From both sources, counsel had more than ample testimony from which to argue Katherine Brown's lack of credibility and possible reasons for changing her testimony.  As noted, the facts underlying Katherine Brown's potential motive for fabricating her testimony were explored through the remaining questioning of Katherine Brown and the testimony of Detective Lyzenga.  The singular limitation on cross-examination complained of here therefore did not deprive Petitioner of his right to present a defense in violation of the Confrontation Clause.  The state court's determination was neither contrary to nor an unreasonable application of established Supreme Court precedent.

### III.      Improper Exclusion of Evidence – Robert Glass Admission

Petitioner next argues that witness John Dent should have been permitted to testify that "Yankee" (Robert Glass) admitted to Dent that he committed the shooting at So-So's on the evening in question.  Sustaining an objection, the court instructed the jury to disregard Dent's testimony that Glass admitted to the shooting.  (Tr. VIII, 1214.)  Petitioner asserts that the exclusion of evidence of Glass' confession violated his right to due process in accordance with *Chambers v Mississippi*, 410 U.S. 284 (1973).

- 46 -

As previously discussed, the Constitution confers upon criminal defendants the right to present a complete defense, subject to reasonable restrictions on the admission of testimony. See *Scheffer*, 523 U.S. at 308; *Taylor*, 484 U.S. at 410; *Rock*, 483 U.S. at 55; *Chambers*, 410 U.S. at 295. A petitioner "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302. In applying its evidentiary rules, a state must weigh the interests served by the rule against the limitation imposed upon the defendant's constitutional right to present a defense. *See Rock*, 483 U.S. at 56.

In *Chambers*, the Supreme Court invalidated a state's hearsay rule on the ground that it abridged the defendant's right to "present witnesses in his own defense." 410 U.S. at 302. Chambers was tried for a murder to which another person repeatedly had confessed in the presence of acquaintances. The state trial judge barred the evidence because the state hearsay rule did not contain an exception for declarations against penal (as opposed to pecuniary) interest. *Id.* at 299. Moreover, the state's "voucher" rule, which prohibited parties from impeaching their own witnesses, barred Chambers from calling the declarant to the stand and introducing his out-of-court statement against him. *Id.* at 295-96. The Supreme Court held that local rules of evidence cannot be applied "mechanistically" when such rules would threaten the "fairness and reliability [of] . . . the ascertainment of guilt and innocence" and thereby "defeat the ends of justice." *Id.* at 302. In assessing the reliability of the hearsay testimony, the Court in *Chambers* found that some exculpatory statements contained a "persuasive assurance of trustworthiness," because (1) the confession was spontaneously made to two close acquaintances shortly after the murder occurred; (2) each statement was corroborated at trial by other independent evidence; (3) the confession was

self-incriminating and unquestionably against penal interest; and (4) the declarant was available for cross-examination.  *Id.* at 300-301.

Since that time, in *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court rejected another categorical exclusion, that is, Texas' blanket exclusion of the testimony of other persons charged as principals, accomplices or accessories in the same crime.  388 U.S. at 15.  The Supreme Court held:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19.  *See also Crane v. Kentucky*, 476 U.S. 683 (1986) (holding that the exclusion of testimony regarding the circumstances of the petitioner's confession for purposes of assessing the reliability and credibility of the confession deprived him of his right to present a defense); *Rock*, 483 U.S. at 61 (striking down Arkansas' per se rule excluding all hypnotically refreshed testimony because it placed an arbitrary restriction on a criminal defendant's constitutional right to testify on her own behalf).

Although *Chambers* and its progeny unquestionably remain "the law," recent decisions of the Supreme Court have made clear that *Chambers* may be invoked only in extreme cases.  For example, in *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996), a plurality of the Court sought to limit *Chambers* to its facts, stating:

> Thus, the holding in *Chambers* – if one can be discerned from such a fact-intensive case – is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded,

> but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Egelhoff*, 518 U.S. at 52. Similarly, dicussing *Crane*, the *Egelhoff* Court stated that it's decision "[did] nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a 'valid' reason." *Egelhoff*, 518 U.S. at 53.

Most recently, a majority of the Supreme Court held that a per se rule against admission of polygraph evidence in court martial proceedings did not violate the Fifth or Sixth Amendment rights of accused to present a defense. *See Scheffer*, 523 U.S. 303 (1998). The Court held that state rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). The Court added that the exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it has infringed upon a weighty interest of the accused." *Id.* As the *en banc* Sixth Circuit recently observed, "the Supreme Court has made it perfectly clear that the right to present a 'complete' defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions." *Rockwell v. Yukins*, 341 F.3d 507, 512 (2003) (en banc), *cert. denied* 124 S. Ct. 1601 (2004).

Furthermore, *Chambers* was decided before the enactment of the AEDPA, and, thus, the Court did not apply the highly deferential AEDPA standard. Under the AEDPA, a federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather,

the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.  As the Sixth Circuit recently stated in reviewing a state court's determination to exclude hearsay evidence, "[w]hether this court would or would not have come to the same conclusion reached by the Michigan Court of Appeals as to the trustworthiness of the preferred statements is completely irrelevant."  *Allen v. Hawley*, No. 01-1320, 2003 WL 21911327, at *6 (6th Cir. Aug. 7, 2003).  The question is whether the Michigan Court of Appeals unreasonably applied *Chambers* and its progeny.  *Id.*

 The cited Supreme Court cases involved the wholesale exclusion of an entire category of evidence or witnesses. Unlike *Chambers*, MICH. R. EVID. 804(b)(2) does not require the wholesale exclusion of all statements against penal interest.  Rather, the Rule provides a hearsay exception for statements against penal interest where corroborating circumstances indicate trustworthiness.  There is no question that statements inculpating the declarant and exculpating the defendant are inherently suspect.  *See Chambers*, 410 U.S. at 299-300, *United States v. Noel*, 938 F.2d 685, 688-89 (6th Cir. 1991).  Accordingly, the requirements of MICH. R. EVID. 804(b)(2) are not "arbitrary" or "without justification".

 In reviewing the trial court's decision for plain error,[4] the Michigan Court of Appeals held as follows:

> At trial, Dent testified that both defendant and Glass told him that Glass had been the shooter.  The trial court properly excluded Dent's testimony concerning Glass' admission of guilt because Glass' statement did not bear the persuasive indicia of trustworthiness.  *Chambers v. Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L

---

[4]The Michigan Court of Appeals found that Petitioner had failed to preserve the issue below and thus reviewed only for plain error affecting substantial rights.  (See 2/27/01 MCOA Op. at 3.)  I note, however, that the issue was the subject of a record argument and decision covering seven pages of trial transcript.  (Tr. VIII, 1206-1212.)  The issue clearly was preserved for appeal and therefore was not procedurally defaulted.

Ed 2d 297 (1973); *People v. Conte*, 152 Mich App 8, 13; 391 NW2d 763 (1986). Glass' confession lacked indicia of trustworthiness because (1) the admission established that the shooting occurred outside of So-So's, which contradicts all other evidence introduced at trial that established that the shooting occurred within So-So's, including defendant's own testimony, and (2) defendant denied knowing Dent or making any statement to Dent. Moreover, Glass testified at trial and was subject to cross-examination by defendant.

(2/27/01 MCOA Op. at 3.)

The conclusion by the court of appeals that the statement lacked the indicia of trustworthiness was not unreasonable under *Chambers*. As noted above, in *Chambers*, the Supreme Court found the hearsay statement sufficiently reliable because (1) the confession was spontaneously made to two close acquaintances shortly after the murder occurred; (2) each statement was corroborated at trial by other independent evidence; (3) the confession was self-incriminating and unquestionably against penal interest; and (4) the declarant was available for cross-examination. *Id.* at 300-01. In this case, as noted by the Michigan Court of Appeals, Glass' alleged admission was completely at odds with all of the trial evidence, including Petitioner's own testimony. According to Dent, Glass claimed he lured the victim outside So-So's and then shot him. All other evidence indicated that the shooting occurred in the bar. In addition, Glass' alleged confession was made in Petitioner's company and purportedly paralleled Petitioner's own statement to Dent, undermining a finding of spontaneity. Both of these factors weigh heavily against the admission of Glass' statement.

The court of appeals considered these factors, among others, in concluding that Glass' statement lacked sufficient indicia of trustworthiness to be admitted at trial. In the circumstances of this case, trial court's ruling under M.R.E. 804(b)(3) was neither arbitrary nor disproportionate to the purpose of the rule, *i.e.*, to prevent the admission of unreliable hearsay evidence. Accordingly,

- 51 -

I cannot find that the trial court's decision to exclude Glass' hearsay statement was an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *See Allen v. Hawley*, No. 01-1320, 2003 WL 21911327, at *6 (6th Cir. Aug. 7, 2003) (state trial court did not unreasonably apply Supreme Court precedent, so as to warrant habeas relief, when it concluded that the trustworthiness required for admission of a hearsay statement against penal interest was absent). The fact that this or another court would have made a different judgment call is without consequence for purposes of review under the AEDPA. *See Rockwell*, 341 F.3d at 512; *Allen*, 2003 WL 21911327 at *6.

### IV.    Prosecutorial Misconduct – Questioning of Witnesses

In his fourth ground for habeas relief, Petitioner argues that the prosecutor engaged in misconduct when he improperly acted as a witness by challenging witnesses on the basis of what they allegedly told the prosecutor outside the courtroom. The Michigan Court of Appeals addressed the issue as follows:

> Defendant asserts that the prosecutor engaged in misconduct when he improperly acted as a witness by challenging witnesses on the basis of what they allegedly had told the prosecutor. . . . We conclude that defendant has failed to demonstrate error requiring reversal. The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Foster*, 175 Mich App 311, 317; 437 N.W.2d 395 (1989). A prosecutor engages in misconduct when the prosecutor injects personal knowledge into the proceedings through testimonial questioning. *People v. Christensen*, 64 Mich App 23, 28-29; 235 N.W.2d 50 (1975).
>
> . . .
>
> With respect to defendant's unpreserved claim that the prosecutor engaged in improper testimonial questioning during the examination of Latonia Thrash, we conclude that defendant has not shown a plain error that affected substantial rights, i.e., that the outcome of the proceeding would have been different. *Carines*, supra at 763, 774; *People v. Schutte*, 240 Mich App 713, 720; 613 N.W.2d 370 (2000) (this Court reviews unpreserved claims of prosecutorial misconduct for plain error). Our

- 52 -

> review of the record indicates that the prosecutor's questions did not constitute improper testimonial questioning because the question did not impart personal knowledge of the prosecutor to the jury. The challenged question was merely a reference to the testimony that preceded it.

(2/27/01 MCOA Op. at 4.) As the Michigan Court of Appeals noted, the Petitioner failed to preserve the error by objecting at trial. The Michigan Court of Appeals expressly relied on Michigan's contemporaneous objection rule in denying Petitioner's claim. It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. See, e.g., *People v. Kelly*, 423 Mich. 261, 271, 378 N.W.2d 365 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Accordingly, review by this Court is barred unless Petitioner can show cause and prejudice, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485. Further, even when the state court reviews the issue under a manifest injustice standard or to prevent a miscarriage of justice, Petitioner's failure to object is still considered a procedural default. See *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989); *see also Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998)) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)).

Petitioner has not attempted to demonstrate cause for the procedural default. Moreover, even were Petitioner's procedural default excused, his claim would be rejected. Misconduct by a prosecutor can rise to the level of a constitutional violation. *Lundy v. Campbell*,

888 F.2d 467, 474 (6th Cir. 1989).  For habeas relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The Supreme Court has emphasized a series of factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process:  (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court.  *See Darden*, 477 U.S. at 182-83; *United States v. Young*, 470 U.S. 1, 12-13 (1985); *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

In *Berger v. United States*, 295 U.S. 78 (1935), the Supreme Court addressed a circumstance in which a prosecutor made assertions calculated to mislead the jury.  *Id.* at 85.  Because the jury will normally place great confidence in the faithful execution of the obligations of a prosecuting attorney, improper insinuations or suggestions are apt to carry more weight against a defendant than such statements by witnesses. The Supreme Court held that insinuations or suggestions by the prosecutor outside the evidence are improper:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a

> criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with vigor--indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88-89. The principles set forth in *Berger* forbid the government's injection of improper or prejudicial material that deprives an accused of his or her right to a fair trial. For instance, the government prosecutor may not express to the jury his or her personal knowledge of the guilt of the accused, *United States v. Bess*, 593 F.2d 749, 754 (6th Cir. 1979), or bring to the jury's attention purported facts that are not in evidence and are prejudicial, *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976) (*citing Berger*, 295 U.S. at 88, 55 S.Ct. at 633). *See also United States v. Solivan*, 937 F.2d 1146, 1150-51 (6th Cir. 1991).

The Michigan Court of Appeals expressly found that the prosecutor's comment did not constitute improper testimony, but instead referred to earlier statements made by the witness during the course of her testimony. That finding is presumed to be correct unless rebutted by Petitioner by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Having reviewed the record transcript (Tr. VIII, 1185), I find that the determination of the court of appeals not only was reasonable, but also undoubtedly was correct. All of the record evidence indicates that the prosecutor was referring the witness to her earlier responses during the course of an examination in which the witness made a series of unclear and apparently contradictory statements. Accordingly, the state court determination was patently reasonable.

## V.      Improper Use of Grand Jury Testimony

Petitioner asserts that his right to confrontation under the Sixth Amendment was violated by the prosecutor's use of grand jury testimony, which had never been subject to cross-examination, to "jumpstart" Robert Glass' lack of memory at the time of trial.  Again, the state court declined to address the question on the merits because Petitioner failed to object at the time the evidence was introduced, and because he also had the opportunity to cross-examine Glass at trial about his grand jury testimony.  (2/27/01 MCOA Op. at 5.)

As I previously observed, the contemporaneous objection rule was well-established at the time of Petitioner's trial.  *See, e.g., Kelly*, 423 Mich. at 271.   Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84.  As a result, the Court will review the claim only if Petitioner can show cause and prejudice, or a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.

Petitioner makes no attempt to demonstrate cause for his procedural default. Ineffective assistance of counsel can serve as cause to excuse a procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  However, to serve as cause to excuse a procedural default, a claim of ineffective assistance of counsel must be properly exhausted.  *Edwards*, 529 U.S. at 453. While Petitioner raises a claim of ineffective assistance of trial counsel in his petition, he never argues that counsel was ineffective for failure to object to the use of Glass' grand jury testimony. He also did not raise the argument in the state courts.  Ineffective assistance of trial counsel therefore cannot excuse the default.  Petitioner makes no other argument that would demonstrate cause.

Where a petitioner fails to show cause, the court need not consider whether he has established prejudice.  *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Leroy v. Marshall*, 757 F.2d 94, 100 (6th Cir. 1985).  Nor has petitioner suggested any fundamental miscarriage of justice and none is apparent.  As the Michigan Court of Appeals observed, notwithstanding Glass' testimony that he did not see petitioner with a gun that night, "other witnesses testified that they observed petitioner with a gun either immediately before, during, or after the shooting."  (2/27/01 MCOA Op. at 5.)  "Any error," as the Court of Appeals held, "did not effect [sic] the outcome of the proceeding. . ." *Id.*

### VI.    Improper Exclusion of Evidence – Testimony About Witness Position

In his sixth ground for habeas relief, Petitioner argues that the trial court improperly and unconstitutionally excluded defense questioning of Leonora Jones as to whether her brother, Anthony Hardin, was in a position to view the shooting.  Petitioner asserts that the limitation improperly limited his right to cross-examination and impaired his right of confrontation under the Sixth Amendment.

As previously discussed, the primary interest secured by the Confrontation Clause of the Sixth Amendment is the right of cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (citing *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)).  The Confrontation Clause generally guarantees only "an opportunity for effective cross-examination," *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  It does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 20.  In *Chambers*, 410 U.S. at 30, the Court made clear that in the exercise of this right, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."  The right to present relevant evidence during cross-

examination "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295; *accord Rock v. Arkansas*, 483 U.S. 44, 55 (1987) ("The right to present relevant testimony is not without limitation.").

Although Petitioner raised the constitutional issue in his state-court proceedings, the Michigan Court of Appeals addressed the matter solely as one of state law. As I previously have observed, the Sixth Circuit has clarified that where the state court clearly did not address the merits of a claim, the federal court on habeas review must conduct de novo review. *McKenzie*, 326 F.3d at 727; *see also Wiggins*, 123 S. Ct. at 254); *Maples*, 340 F.3d at 437 (6th Cir. 2003). In reviewing the claim under state law, however, the Michigan Court of Appeals made certain factual findings that are subject to deference by this Court unless rebutted by clear and convincing evidence. *See Herbert*, 160 F.3d at 1134. The court of appeals made the following determination about the ability of Jones to respond to the kind of questioning sought by Petitioner:

> A review of the record shows that Jones had no knowledge of where her brother was located at the time she saw defendant re-enter the bar and fire additional shots. Accordingly, any testimony on her part regarding whether her brother was in a position to see defendant re-enter the bar and fire additional shots would be purely speculative. Moreover, there is no indication in the record that defendant was precluded from asking that Jones' brother be recalled so that defendant could question him about whether he saw defendant re-enter the bar.

(2/27/01 MCOA Op. at 7.)

This Court must defer to the finding of the Michigan Court of Appeals. Petitioner had ample opportunity and did extensively cross-examine both Leonora Jones and Anthony Hardin regarding the circumstances of the shooting. He also cross-examined Leonora Jones about her position and that of her brother. This examination alone ensured petitioner's right of confrontation. Moreover, on the basis of Jones' testimony, Petitioner has failed to demonstrate by clear and

convincing evidence that the state court erred in determining that Jones' testimony about her brother's ability to see would be speculative.

## VII.    Confrontation Clause – Police Officer Testimony

In his seventh ground for habeas relief, Petitioner asserts that the trial court on several occasions permitted police officers to testify to a variety of hearsay information.  Petitioner contends that the improper hearsay admissions violated his constitutional right under the Confrontation Clause of the United States Constitution.

As  noted at several earlier points in this report, the Sixth Amendment guarantees to the criminal defendant the right "to be confronted with the witnesses against him."  The Supreme Court has held that

> the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination.

*California v. Green*, 399 U.S. 149, 157-58 (1970).  Thus, where the declarant testifies and is cross-examined, "our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem."  *Green*, 399 U.S. at 162; *see also United States v. Owens*, 484 U.S. at 560 (inquiry into the "indicia of reliability" or the "particularized guarantees of trustworthiness" of the out-of-court statements is not called for when the declarant is available at trial and subjected to unrestricted cross-examination, because "the traditional protections of the oath, cross-examination, and opportunity for the jury to observe the witness' demeanor satisfy the constitutional requirements").

In the instant ground for relief, Petitioner raises a number of specific instances in which hearsay testimony was admitted at trial, only some of which were the subject of objections at trial. In addressing the claims, the Michigan Court of Appeals held as follows:

> Defendant next claims that the trial court improperly admitted numerous instances of hearsay testimony from police officers regarding what others had told them or what they "ascertained" from what others had told them. While Defendant preserved many of his hearsay challenges by objecting below, some of the hearsay challenges and defendant's constitutional challenge were not raised below. We will review defendant's preserved, nonconstitutional hearsay challenges under the "more probable than not" standard, i.e., defendant must show that it is more probable than not that a different outcome would have resulted without the error. *Lukity, supra*; *see, also, Carines*, *supra* at 774. Defendant's unpreserved challenges, both constitutional and nonconstitutional, will be reviewed under the plain error that affected substantial rights standard, i.e. that the error affected the outcome of the proceeding. *Carines, supra* at 763-764, 774.

> Hearsay is defined as a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. MRE 801(a).

> After reviewing the record and defendant's many instances of alleged hearsay challenges, we conclude that many of the statements admitted by the trial court were properly admitted because the statements did not constitute hearsay or were properly admitted as third-party identification testimony under MRE 801(d)(1)(C) and *People v. Malone*, 445 Mich 369, 377-78, 384-85, 389-90; 518 NW2d 418 (1994). Further, one of the complained-of challenges was sustained by the trial court after defendant's hearsay objection. Accordingly, if error did occur in this instance, it was cured by the trial judge's action. Even assuming that the trial court did improperly admit several of the hearsay statements, our review of the record establishes that the outcome of the proceedings was not affected by the errors. Defendant has failed to establish evidentiary error warranting reversal.

(2/27/01 MCOA Op. at 7-8, docket # 37.)

The Michigan Court of Appeals determined that Petitioner's constitutional challenge under the Confrontation Clause was not properly raised in his objections at trial. As a result, the court reviewed the constitutional challenge only for plain error affecting substantial rights. As I

previously noted, the Michigan court's reliance upon Petitioner's failure to properly object at trial renders the constitutional claim procedurally defaulted. *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84. As a result, the Court ordinarily will review the claim only if Petitioner can show cause and prejudice. *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.

Petitioner makes no attempt to demonstrate cause for his procedural default. While Petitioner raises a claim of ineffective assistance of trial counsel in his petition, he never argues that counsel was ineffective for failing to object to the hearsay admissions on the grounds of constitutional violation. *Edwards*, 529 U.S. at 453 (ineffective assistance of counsel may constitute cause to excuse procedural default). Petitioner therefore fails to demonstrate cause excusing his procedural default.

Moreover, even were Petitioner's claim not procedurally defaulted, his claim would be without merit. First, Petitioner points to Detective Lyzenga's testimony that he had ascertained from interviews and records that the "Baby D" mentioned by Dorothy and Kathy Brown and Tonya Griver, was Petitioner. All three witnesses, however, subsequently independently identified Petitioner themselves. The fact that Lyzenga discovered information first leading him to suspect that Petitioner was "Baby D" did not constitute significant additional evidence. Because the evidence could not have had a "substantial and injurious effect or influence in determining the jury's verdict," it was, at most, harmless error. *See Nevers v. Killinger*, 169 F.3d 352, 371 (6th Cir. 1999) (holding that *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), harmless error standard continues to apply on habeas review even after the amendments to the AEDPA). Petitioner cannot establish that the error resulted in actual prejudice. *McGhee v. Yukins*, 229 F.3d 506, 513 (6th Cir. 2000).

In addition, the fact that Lyzenga was permitted to testify as to his efforts to find a person by the name of "Way Out" does not involve the introduction of impermissible hearsay. Although Lyzenga testified in a limited fashion about the results of what he had been told, the evidence was admissible to prove the efforts he had made to eliminate "Way Out" from the investigation. Further, the fact that Lyzenga and Williams never heard the name "Rod Fee" during the investigation does not amount to impermissible hearsay. Whether or not a name was mentioned does not go to the truth of the matter asserted, but only to whether it was said. The fact that a person was not mentioned is simply not within the ambit of the Confrontation Clause. In addition, Lyzenga's mention of the identifications made by Katherine Brown and Naeem Wahid were not impermissible hearsay. They were admissible to demonstrate that the identifications at trial were not recent fabrications. Further, because the witnesses testified subject to cross examination, no Confrontation Clause issue has been proven. *See Green*, 399 U.S. at 162.

Similarly, Officer Kooistra's testimony that Ernest Watson identified Petitioner while being driven home from the lineup was admissible as non-hearsay because it was relevant to proving that Watson had not manufactured his identification after the date of the lineup. In addition, Watson himself testified as to his statements to Kooistra, during which he was subject to cross-examination. Therefore, because Watson himself testified to the out-of-court statement to Kooistra, no constitutional right was implicated by Kooistra's testimony. Id. In any event, any admission of the testimony was harmless because it was cumulative. *Nevers*, 169 F.3d at 371.

The testimony of Officer Williams regarding the out-of-court statements made to him by Fee, Dent and Bowman also were admissible for the purpose of demonstrating that all three had made statements during the investigation that were consistent with their trial testimony. Further, all

three witnesses were subject to cross-examination.  As a result, the Confrontation Clause was not implicated. *See Green*, 399 U.S. at 162.  Moreover, because each witness testified consistent with the out-of-court statements, the admission of the consistent hearsay statements was necessarily harmless. *Nevers*, 169 F.3d at 371.

In sum, Petitioner has failed to demonstrate either a violation of the Confrontation Clause or that any admission was not harmless.   As a result, the conclusion by the Michigan Court of Appeals that Petitioner had failed to demonstrate plain error that affected the outcome of the proceedings was not contrary to or an unreasonable application of Supreme Court precedent.  28 U.S.C. § 2254(d).

### VIII.   Prosecutorial Misconduct – Improper Argument

Petitioner contends that the prosecutor made constitutionally improper arguments to the jury during closing arguments.  He asserts that the prosecutor created an atmosphere of fear in his closing argument by suggesting that all the witnesses were afraid of Petitioner and that those witnesses who identified Petitioner or gave other incriminating evidence were courageous. He refers to a limited number of statements, to which objections were made, over the course of ten pages of transcript:

> MR. VANDERMOLEN:  . . . But I submit to you that it doesn't appear that he (Ernest Watson) saw much, if he saw anything.  It indicates that he, like other witnesses are afraid to identify the defendant when faced with him, I submit to you, for reasons that are obvious, also, because they know he kills people for very little reason.  And –

> MR. PLASZCZAK:  I would object, your Honor, I don't believe that is in evidence.

> THE COURT:  Again, I believe that's a factual objection, and it's up to the jury to make the factual determinations from the evidence.  You may continue.

. . .

MR. VANDERMOLEN: But in addition to those six people that see the defendant and have the courage to stand up here and positively identify him in court, as being the person responsible for these crimes, and I submit to you that it is an act of courage on their part . . . Because if you had just seen someone murder somebody in cold blood, there's no guarantee that he just doesn't walk out of here at the end of this trial. How do you –

MR. PLASZCZAK: If it may please the Court, I believe that that's an improper and prejudicial argument on the part of the prosecutor.

THE COURT: Well, of course, the jury will be reminded in a few moments, after our break, of reasonable doubt, of burden of proof, of the fact that penalty doesn''t affect their decision at all, and all the standard instructions; that all, although standard, are very important, and in a few moments they will hear those, and I think we ought to just wind this up and move along here.

. . .

MR. VANDERMOLEN: I just feel compelled to point out, I submit, the extraordinary courage on the part of the people that have pointed out and positively identified the defendant as the shooter here, because I submit to you, many people have not that could have, and this is a caliber –

MR. PLASZCZAK: Again I'm going to object, your Honor, he's referring that people could have. There's nothing in evidence to support that at all.

THE COURT: Both sides have referred off and on to witnesses who are not here, and kind of read things into that, and I instruct the jury that all you are to consider is the witnesses you've actually heard from. That's the old standard instruction. The evidence comes in in the open courtroom. We're not going to speculate or guess as to what other witnesses may or may not have said, or if there were any other witnesses.

Okay, you may continue.

. . .

MR. VANDERMOLEN: . . . But that's the caliber of people we're talking about here. Caliber of people that have the courage to stand up and say what they saw, despite the obvious risks.

- 64 -

(Tr. XI, 1677-1686.)

          The Michigan Supreme Court rejected Petitioner's claim of prosecutorial misconduct

as follows:

> Defendant claims that the prosecutor attempted to shift the burden of proof when he argued facts not in evidence by asserting that various witnesses were afraid to testify against defendant and when the prosecutor advanced a civic duty argument. We conclude that defendant was not deprived of a fair and impartial trial by prosecutorial misconduct. *Foster, supra* at 317.

> While a prosecutor may not make a statement of fact to the jury that is unsupported by the evidence, *People v. Stanaway*, 446 Mich 643, 686; 521 N.W.2d 557 (1994), the prosecutor may argue the evidence and all reasonable inference arising from it to the jury, *People v. Bahoda*, 448 Mich 261, 282; 531 N.W.2d 659 (1995). Our review of the record indicates that the prosecutor's argument was supported by the evidence and reasonable inferences drawn therefrom. The testimony of Brown and Bowman provided factual support for the prosecutor's argument that witnesses were afraid to identify defendant as the shooter. Moreover, from the fact that Watson identified defendant outside of defendant's presence, but refused to do so in defendant's presence, the prosecutor could reasonably infer that Watson was afraid to identify defendant.

> We also reject defendant's claim that he was denied a fair trial because the prosecutor appealed to fear and the jury's sense of civic duty. Assuming arguendo that the prosecutor's argument was improper because it appealed to the jury's sense of civic duty, i.e., the need to reward the witnesses for their courage and the need to protect the witnesses from defendant by convicting defendant, we conclude that any error was harmless because the prosecutor's argument was not of such an inflammatory nature so as to have resulted in the jury rendering a verdict based on fear rather than the evidence.

(2/27/01 MCOA Op. at 8.)

          As I previously noted, for habeas relief to be granted, the prosecutorial misconduct

must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due

process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643); *see also Wilson v. Mitchell*,

250 F.3d 388, 399 (6th Cir. 2001) (citing *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir.

1999)).  In such a case, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith*, 455 U.S. at 219. The Supreme Court has identified various factors to be evaluated in determining whether prosecutorial misconduct so infected the trial as to amount to a violation of due process:  (1) whether the comments were isolated or pervasive, (2) whether they were deliberately or accidentally placed before the jury, (3) the degree to which the remarks had a tendency to mislead and prejudice the defendant, (4) whether the prosecutor manipulated or misstated the evidence, (5) the strength of the overall proof establishing guilt, (6) whether the remarks were objected to by counsel and (7) whether a curative instruction was given by the court. *See Darden*, 477 U.S. at 182-83; *Young*, 470 U.S. at 12-13; *Donnelly*, 416 U.S. at 646-47; *Berger*, 295 U.S. at 84-85.

The Michigan Court of Appeals properly considered the nature of the prosecutor's remarks and the extent of the potential impact.  First, the comments identified by Petitioner were not continuous, but occurred over the space of ten pages of transcript.  In addition, the first comment, as to which the court overruled the objection, was supported by testimony of two witnesses who specifically reported being scared.  Dorothy Brown testified that she was afraid when Petitioner called her the day after the shooting.  (Tr. II, 299.)  In addition, Garlinda Bowman testified that she identified no one at the lineup "[b]ecause I thought they could see me, I was scared."  She testified that while she was being driven home she told the detective that she had recognized Petitioner as one of the people who beat-up the victim.  (Tr. III, 457.)  The Michigan Court of Appeals concluded that the argument was proper argument from the evidence and reasonable inferences.  While this Court might have reached a different conclusion, were it deciding the question in the first instance, the conclusion reached by the Michigan courts is not unreasonable.

The remaining comments, while not specifically  overruled, were followed by reminders from the court regarding the limitation on the jury to consider only the evidence introduced and to avoid speculation of other potential evidence that did not come into evidence. Balancing the factors identified by the Supreme Court, I conclude that the Michigan Court of Appeals' determination that the prosecutor's remarks did not deny Petitioner a fair trial was not objectively unreasonable.

### IX.    Unconstitutionally Suggestive Lineup

Petitioner next argues that the pretrial identification lineup was unduly suggestive. Gayle Brennan of the Kent County Defender Officer, who was present at the lineup, testified at a June 14, 1993 evidentiary hearing that she became concerned about differences in hairstyle, body size and facial hair between Petitioner and the other men in the lineup.  According to the testimony introduced at the motion hearing, Brennan knew of another prisoner in the jail who had features and hair that was similar to Petitioner's, and she requested the prisoner be added to the lineup.  Her suggestion that the prisoner be added to the lineup was rejected by the deputy.  Brennan testified that she also was concerned about comments made by assistant prosecutor Steven Dunker that suggested that the shooter was among those in the lineup.  (Mot. Tr. 6/14/93, 39-44.)

The trial court concluded in a written opinion that the photographs of the lineup demonstrated "that the people chosen for the line-up were sufficiently similar to provide a meaningful line-up and to not provide any type of suggestive identification of the Defendant himself."  (7/13/03 Cir. Ct. Op. at 3; dkt # 3.)  The court also found that the description of the question asked by the prosecutor at the lineup was "simply a way of defining or describing the person that the witnesses were asked to identify were present.  It is the Court's Opinion that this was not

suggestive and did not taint the line-up at issue." (Id. at 3.)  The Michigan Court of Appeals carefully reviewed Petitioner's objections to the fairness of the lineup procedures and reached the following determinations:

> Defendant contends that the trial court erred in refusing to suppress the identification evidence because the lineup was unduly suggestive. We disagree. This Court reviews a trial court's ruling on a motion to suppress evidence on legal grounds for clear error. *People v McElhaney*, 215 Mich App 269, 273; 545 N.W.2d 18 (1996). The suggestiveness of a corporeal lineup is to be examined in light of the totality of the circumstances. *People v. Kurylczyk*, 443 Mich 289, 311-12 (Griffin, J.), 318 (Boyle, J.); 505 N.W.2d 528 (1993). Generally, physical differences between a suspect and other lineup participants do not, in and of themselves, constitute impermissible suggestiveness. *Id.* at 312 (Griffin, J.), 318 (Boyle, J.). Physical differences among lineup participants are significant only to the extent that they are apparent to the witness and substantially distinguish the defendant from the other participants in the lineup. *Id.* It is then that there exists a substantial likelihood that the differences among lineup participants, rather than recognition of the defendant, were the basis of the witness' identification. *Id.*

> We reject defendant's claim that the lineup was impermissibly suggestive because of the physical differences between defendant and the other four participants. The photograph of the lineup participants shows that the participants were roughly the same height, with only a few inches difference between the tallest and the shortest. A few of the participants had a darker complexion than defendant, and one appears to have had the same complexion as defendant. The other four participants had closely-cropped hair while defendant was the only participant who was bald and who had facial hair (*i.e.*, a mustache). Finally, defendant had a physique similar to that of one other participant, while the other three were slimmer. Our Supreme Court has stated that a lineup is not impermissibly suggestive where the defendant was the second tallest participant and heavier than the other participants, where age and height differences existed between defendant and the other participants, where defendant was the only participant with a scarred face, and where the defendant was the only participant with a mustache and goatee. *Id.* Based on the photograph and the fact that only three of the twelve witnesses identified defendant, we conclude that the physical differences that existed between defendant and the other four participants were of insufficient magnitude to substantially distinguish defendant from the other participants.

> We also reject defendant's claim that the assistant prosecutor present at the lineup made a comment that suggested that the shooter was in the lineup. The testimony on which defendant relies established that the assistant prosecutor neither

imparted to the witnesses that the police had arrested the actual shooter nor that person number 4 in the lineup (*i.e.*, defendant) was the actual shooter. Instead, the testimony established only that the assistant prosecutor posed a general question meant to ascertain whether any of the witnesses recognized anyone in the lineup. Given the totality of the circumstances as set forth above, we conclude that the trial court did not clearly err in determining that the corporeal lineup was not impermissibly suggestive.

(2/27/01 MCOA Op. at 2.)

When reviewing a petitioner's claim that an out-of-court identification violated his or her due process rights, the court's primary concern is with the reliability of the evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977); *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001). This Court applies a two-part inquiry. "First, the court evaluates the undue suggestiveness of the pre-identification encounters." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). Second, if the identification procedures are found to be unduly suggestive, the Court turns to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. *Wilson*, 250 F.3d at 397. The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *Wilson*, 250 F.3d at 397.

The Michigan Court of Appeals, like the trial court, based its conclusion on the first prong of the inquiry, that is, whether the pre-identification encounters were unduly suggestive. *Wilson*, 250 F.3d at 397. Both courts concluded that the persons participating in the lineup were sufficiently similar to prevent suggestive identification. The court of appeals noted that the

participants were roughly the same height. Three participants were slimmer, while one other was similar in build. Three had a darker complexion, but one had a similar complexion. While Petitioner was the only bald participant, all four of the other participants had closely cropped hair.[5] The court concluded that the physical differences were of insufficient magnitude to distinguish Petitioner. The court also concluded that the question allegedly asked by the prosecutor was not unduly suggestive, but instead merely described the person the witnesses were asked to identify.

As previously observed, the Court accords a presumption of correctness to findings of state appellate courts, as well as the trial court. *See* 28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Smith*, 888 F.2d at 407 n.4. Petitioner has failed to demonstrate clear and convincing evidence of error in the courts' factual conclusions. 28 U.S.C. § 2254(e)(1). Further, this Court may grant habeas corpus relief only if the state-court determinations about the suggestiveness of the lineup and the question of the prosecutor were objectively unreasonable. *William*s, 529 U.S. at 410-11; 28 U.S.C. § 2254(d)(1). Petitioner has failed to demonstrate that the court of appeals' determinations were objectively unreasonable. Petitioner's ninth ground for habeas relief therefore should be denied.

## X.    Improper Reference to Jail

Petitioner asserts that the prosecutor improperly solicited testimony from Rod Fee that Fee had met Petitioner in jail. Because Petitioner failed to object at trial, the Michigan Court of Appeals reviewed the question only for plain error affecting Petitioner's substantial rights. As I previously have noted, Michigan's contemporaneous objection rule was well-established at the time

---

[5]I also note that, at the time of the shootings, Petitioner purportedly had long hair, combed back into a ponytail or a wave. The fact that Petitioner's shaved head was substantially different from the hair described by most witnesses further undermines a conclusion that the lineup was unduly suggestive.

of Petitioner's trial.  *See, Kelly*, 423 Mich. at 271.  The rule is designed to arm trial judges with the information needed to rule reliably, and clearly serves a legitimate governmental interest.  *Lee*, 534 U.S. at 385.  Petitioner's failure to comply with the state's independent and adequate state procedural rule, i.e., making a contemporaneous objection, caused him to default his claims in state court.  *See Wainwright*, 433 U.S. at 87-88; *Lancaster*, 324 F.3d at 437; *West*, 73 F.3d at 84.  Accordingly, review by this court is barred unless Petitioner can show cause and prejudice, or a miscarriage of justice.  *Coleman*, 501 U.S. at 750; *Murray*, 477 U.S. at 485.  Petitioner has failed to articulate either cause or prejudice for his default.  Nor was there any fundamental harm to petitioner from testimony he had been in a jail, since he testified himself regarding his incarceration.  (*See* 2/27/01 MCOA Op. at 5.)  This claim therefore is barred.

## XI.     Ineffective Assistance of Counsel at Trial

Petitioner argues that trial counsel was ineffective in three particular ways:  (1) defense counsel failed to hire an investigator as requested by Petitioner; (2) counsel failed to make appropriate motions, including a motion to suppress the identifications under *People v. Kachar*, 400 Mich. 78, 252 N.W.2d 807 (1977); and (3) counsel failed to ask Detective Lyzenga whether he threatened to arrest Dorothy Brown.  Petitioner asserts that he requested remand for an evidentiary hearing on the issue of the effectiveness of counsel, but was denied.  He now asserts that he is entitled to an evidentiary hearing in this court and a determination that he received the ineffective assistance of trial counsel.[6]

---

[6] Generally, habeas corpus actions are determined on the basis of the record made in the state court.  *See* Rule 8, RULES GOVERNING § 2254 CASES IN THE DISTRICT COURT.  An evidentiary hearing in the district court is not mandatory unless one of the circumstances listed in 28 U.S.C. § 2254(e)(2) is present.  *See Sanders v. Freeman*, 221 F.3d 846, 852 (6th Cir. 2000).  Section 2254(e)(2) permits an evidentiary hearing only if:

(A)  the claim relies on –

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); see also *Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  Both prongs of the Strickland test involve mixed questions of law and fact.  *Id.* at 698.  Where counsel's performance did not fall below an objective

---

(i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B)  the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2)(A)-(B).  In the instant case, the factual predicate for the claim is apparent on the record and no further evidentiary development is required.

standard of reasonableness, the court need not reach the question of prejudice. *See United States v. Foreman*, No. 01-3892, slip op. at 8-9 (6th Cir. March 25, 2003).

None of defense counsel's purported errors constitutes the ineffective assistance of counsel. Petitioner's argument that counsel was ineffective in investigating whether lineup witnesses were shown photos of Petitioner before the lineup is merely speculative. The trial transcript contained no testimony and Petitioner has provided no information suggesting that photographs were shown to anyone, other than to Alan Thompson. Thompson did not testify at trial and only assisted officers during their investigation to identify Petitioner as "Baby D.". (Mot. Tr. 6/14/93, 15-16.) Further, the fact that most witnesses failed to identify Petitioner at the lineup strongly suggests that no such demonstrations occurred and therefore counsel could not have been ineffective for failing to hire an investigator. Moreover, assuming such photographs were shown, because most witnesses failed to identify Petitioner at the lineup, Petitioner cannot demonstrate prejudice.

Prior to trial, defense counsel properly moved to suppress the witness identifications on the grounds that the lineup was unduly suggestive. The motion to suppress was denied by the court after an evidentiary hearing. Petitioner now argues that counsel should have specifically argued that the identifications were not admissible under the eight-factor test of *People v. Kachar*, 400 Mich. 78, 252 N.W.2d 807 (1977). In *Kachar*, the court considered the appropriateness of a photographic show-up. The court applied the federal standard for unconstitutionally suggestive identification procedures set forth in *Stovall v. Denno*, 388 U.S. 293, 302 (1967), and *Simmons v. United States*, 390 U.S. 377, 384 (1968). *See Kachar*, 400 Mich. at 90. The Kachar court found that the photographic lineup was unduly suggestive. *Id.* at 91. It then went on to consider whether an independent basis existed for admission of the in-court identification that was not tainted by the

- 73 -

suggestive lineup, applying the nonexclusive factors identified by the Supreme Court in *United States v. Wade*, 388 U.S. 218, 241 (1967). *See Kachar*, 400 Mich. at 93-94 (applying *Wade* and identifying eight factors affecting the independence of an identification following an improper lineup).

The standard applied in *Kachar* for the determining whether a lineup is suggestive does not differ from the constitutional challenge separately raised by Petitioner. As the Michigan Court of Appeals concluded, and as I previously have discussed with respect to Petitioner's ninth ground for relief, the record does not show that the identification procedures used were unconstitutionally suggestive. Where, as here, the lineup was not unduly suggestive, no basis existed for reaching the separate eight-factor determination under *Kuchar* for whether the in-court identifications were sufficiently independent to be admissible. Petitioner therefore has failed to demonstrate that the state court's determination was unreasonable, and counsel cannot be found to be ineffective.

Petitioner also argues that trial counsel was ineffective when he failed to ask Detective Lyzenga whether he had threatened to arrest Dorothy Brown. Petitioner argues that such questioning was critical because Dorothy Brown identified Petitioner only after she had been threatened.

The Michigan Court of Appeals rejected the argument, concluding that Petitioner failed to support his contention:

> [T]he record reveals that, on cross-examination, defense counsel elicited testimony from Lyzenga that Brown did not initially implicate defendant, that Lyzenga then accused Brown of lying, and that Lyzenga told Brown that her lying would land her in trouble.

(2/27/01 MCOA Op. at 10.)  The state court's finding is entirely reasonable.  A review of the record shows that counsel asked Lyzenga what kind of trouble he had indicated Dorothy would be in unless she assisted in identifying Petitioner.  Lyzenga indicated that he was talking about being an accessory after the fact to murder.  (Tr. X, 1464.)  Lyzenga testified, however, that he could not recall whether he actually conveyed the nature of his threat either to Katherine Brown or Dorothy Brown.  (Tr. X, 1467.)  Counsel was well justified in not asking further questions after receiving such responses.  To ask more directly whether a specific threat had been made would run the risk of receiving a denial from Lyzenga, which would have been damaging to Petitioner's theory.  With the kind of responses he already had elicited, counsel was free to and did argue to the jury that Lyzenga had made threats.  (Tr. XI, 1653.)   Petitioner has entirely failed to demonstrate any "acts or omissions [that] were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.

In sum, Petitioner has failed to show that counsel was ineffective in any of the ways identified in his brief.  The state court's finding that counsel was not ineffective was not an unreasonable application of clearly established Supreme Court precedent.

## XII.   Ineffective Assistance of Counsel at Sentencing

In his twelfth ground for habeas relief, Petitioner argues that he received the ineffective assistance of counsel at sentencing.  Petitioner first asserts that counsel did nothing to assist him at sentencing, except to point out one small error in the presentence report and to reiterate that Petitioner maintained his innocence.  Petitioner also asserts that he did not have the opportunity to review the presentence report.  He avers in an attached affidavit that the presentence report contains a claim that Petitioner was running a crack distributorship in Kentucky.  Petitioner asserts that he would have challenged the claim had he been aware of its presence in the report.

- 75 -

The Michigan Court of Appeals concluded as follows:

The decision to address the sentencing court and what information to be given the court are tactical decisions. *People v. Newton (After Remand)*, 179 Mich App 484, 493-94; 446 NW2d 487 (1989). Defendant does not explain what mitigating information defense counsel should have presented during allocution. Accordingly, defendant has failed to establish that defense counsel's performance fell below an objective standard of reasonableness. *People v. Pickens*, 446 Mich 298, 302-02; 521 NW2d 797 (1994).

Defendant also asserts that he did not have an opportunity to review the presentence report (PSIR). Defendant failed to raise this claim below. Moreover, the record contains a statement by defense counsel that both he and defendant had reviewed the PSIR. The record does not support defendant's claim.

(2/27/01 MCOA Op. at 9.)

The decision of Michigan Court of Appeals is patently reasonable. As I previously have noted, in order to show ineffectiveness of counsel, Petitioner must show both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. *Strickland*, 466 U.S. at 687. The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel*, 350 U.S. at 101).

As the Michigan Court of Appeals held, petitioner has identified no mitigating information that counsel should have been expected to produce. He therefore fails to meet his burden of overcoming the presumption that counsel was acting within the range of professional assistance. *Strickland*, 466 U.S. at 687.

With respect to Petitioner's claim that he did not see the presentence report before sentencing, as the court of appeals observed, defense counsel represented at the sentencing hearing that Petitioner had reviewed the presentence report. (Sent. Tr., 36)  Petitioner did not contradict the argument, notwithstanding the fact that he made lengthy remarks to the sentencing court, during which he criticized other decisions made by his counsel.  (Sent. Tr., 40-43.)  The court of appeals' conclusion that Petitioner's claim was not supported by the record is entirely reasonable.  Petitioner therefore has failed to overcome the presumption that the state court's factual finding was correct or to demonstrate that the state-court decision constituted an unreasonable application of established Supreme Court precedent.

<u>Recommended Disposition</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Dated:  November 4, 2005                          /s/ Hugh W. Brenneman, Jr.
                                                 Hugh W. Brenneman, Jr.
                                                 United States Magistrate Judge


**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).